THE STATE vs. JACOB KAPLAN.

Third Judicial District, New Haven, Jan. Term, 1900.   ANDREWS, C. J.,
      TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

To warrant this court in setting aside a verdict as against evidence, its
      injustice must be manifest and the wrong so palpable as to indicate
      that the jury were influenced by corruption, prejudice, or partiality.
A jury is under no obligation to give equal credence to all portions of
      the testimony of a witness, especially that of an accomplice, but
      may properly discriminate in view of all the other evidence in the
      case.
Section 1450 of the General Statutes provides that every person who
      shall receive and conceal stolen property, knowing it to be such,
      shall be prosecuted, tried and punished in the same manner as if he
      had been the principal.   Held that under this statute the degree of
      the receiver's crime and the extent of his punishment were to be
      determined by the value of the goods received and concealed by
      him, and not by the degree of guilt attaching to the actual thief;
      that the receiver might be charged with the theft of such goods,
      and be convicted and punished as if he had stolen goods of the
      value of those so received and concealed.

Argued January 16th—decided April 4th, 1900.

INFORMATION for theft, brought to the Superior Court in
New Haven County and tried to the jury before *Thayer, J.;*
verdict and judgment of guilty upon the second count, and
appeal by the accused for alleged error of the court in refus-
ing to set aside the verdict and grant a new trial for a verdict
against evidence.   *No error.*

The information contained two counts.   The first charged
a theft of 600 pounds of copper, of the value of $108, the
property of the Seymour Manufacturing Company; the second
charged a theft of 555 pounds of copper, of the value of $100,
the property of the same corporation.

Upon the trial the State claimed to have proved two dis-
tinct thefts, one in May and one in September.   The accused
was acquitted on the first count, and convicted on the sec-
ond.   He was sentenced, under § 1449 of the General Stat-

utes, for the theft of property exceeding $50 in value. The charge in the first count was supported by the testimony of one Philibert Fontaine, and, substantially, by his testimony only. The testimony bearing upon the second count tended to prove that the prisoner and one Cohen (who had disappeared), on Saturday night September 16th, in the town of Seymour, took thirty ingots of copper weighing 555 pounds and of the value of $100, and carried the same in a wagon to New Haven; that on Sunday morning, September 17th, they sold the copper to one Maurice Shavitz, a wholesale junk dealer, for $66; that on Monday morning, September 18th, Shavitz sent the copper to the freight depot in New Haven for shipment to Meriden; that the copper was the property of the Seymour Manufacturing Company, and had recently been taken from its factory. There was also evidence tending to show that the thirty ingots, at the time they were taken by the prisoner, were in the cellar of said Fontaine's house, a short distance from said factory, and that they had been taken from the factory to the cellar, a few ingots at a time, by Fontaine, who was a workman in the factory, and that the value of the copper so taken by Fontaine at any one time was less then $50. There was also evidence tending to show that the prisoner Kaplan, Cohen and Fontaine had agreed, before any of the copper was so taken, to steal a quantity of copper from the Seymour Manufacturing Company, and that in pursuance of this agreement Fontaine brought the copper from the factory to his cellar, and about midnight of September 16th, with Kaplan and Cohen, placed the copper in the wagon to be carried away and sold, and that the proceeds of the sale were shared by all.

Fontaine, who was under arrest for the same theft, was placed on the stand by the State for the purpose of proving the charge in the first count, and of proving the identification of the 555 pounds of copper, mentioned in the second count, as the property of the Seymour Manufacturing Company. This identification depended largely if not wholly on his testimony. The claim that the ingots were taken from the factory at different times depended mainly on statements

of Fontaine brought out on cross-examination. The prisoner testified in his own behalf (contradicting his admissions proved by other witnesses) that he did not take the copper from Fontaine's cellar and did not sell it to Shavitz. Shavitz, who had also been arrested for the same theft, testified that he did not buy the copper from the prisoner.

After verdict the prisoner moved for a new trial upon the ground that the verdict was against the evidence. The motion was denied by the trial court, and after sentence the prisoner appealed.

*Benjamin Slade*, for the appellant (the accused).

*William H. Williams*, State's Attorney, for the appellee (the State).

TORRANCE, J. The real question presented by the record is this: Does misconduct upon the part of the jury in reaching their verdict so plainly appear from the evidence certified, that the refusal of the trial court to set aside the verdict exceeds its lawful discretion, and constitutes under our practice and the law of 1897 (Public Acts of 1897, p. 892, § 17, p. 895, § 29) an error in law? *Brooks' Appeal*, 68 Conn. 294, 296; *Loomis v. Perkins*, 70 id. 444, 447.

The working rule or test we have applied in determining such a question, requires the injustice of the verdict to be manifest, and the wrong to be so palpable as to justify the suspicion that the jury or some of them were influenced by corruption, prejudice or partiality. *Johnson v. Norton*, 64 Conn. 134, 135.

Upon a careful examination of the testimony we find no reason for imputing such misconduct to the jury. The counsel for the prisoner has apparently been misled by the erroneous belief that the jury could not lawfully accept as true the testimony of the State's witness Fontaine, so far as it tended to prove the ownership of the stolen property, and reject other portions of his testimony as untrue or unreliable. Such discrimination is within the power of the jury in respect

to every witness; and when the witness is an accomplice, or one whose credit is clearly impeached by facts disclosed on the trial, it may be the duty of the jury to act upon those parts of his testimony so related to and confirmed by other evidence as to command their credence, and to reject the rest as unreliable. Such weighing of the credit of a witness can never be reviewed by this court; the error it can review consists in a misconception of all the evidence so apparent as to compel the inference of misconduct in law.

But the accused further claims that, upon any permissible state of facts which the jury might have found, their general verdict of guilty is as matter of law so manifestly against the weight of the evidence as to entitle him to a new trial. He claims that, at the very most, the evidence in the case shows (1) that Fontaine alone stole the copper in question; (2) that he did this by several separate and distinct thefts of portions of it, each portion stolen, by any one theft at any one time, being of a value not exceeding fifteen dollars; and (3) that the accused received, at one time and as a single transaction, all of said copper from Fontaine, and then concealed it.

Upon these facts he contends, (1) that Fontaine was not guilty of a state's prison offense, and could not be punished for such an offense; and (2) that under our statute relating to receivers of stolen goods the accused could not be found guilty of nor punished for a state's prison offense. This last claim is based upon § 1450 of the General Statutes, which reads as follows: "Every person who shall receive and conceal any stolen goods or articles, knowing them to be stolen, shall be proceeded against as a principal, although the person who committed the theft be not convicted thereof; and shall be prosecuted and tried before the same court, and punished in the same manner as if he had been the principal." The contention is that under this law, and upon the assumed facts proved in the case, Kaplan cannot be convicted of nor punished for a state's prison offense, because Fontaine could not be so convicted nor punished. In short, the claim is that because the statute says that the receiver shall be "punished in the same manner as if he had been the principal," the guilt

of the receiver is in all cases to be measured by the guilt of the thief who stole the goods received. If this is the true construction of the statute, and the evidence is as the accused claims it to be, then his claim that the verdict was against the weight of the evidence would be entitled to serious consideration; but we are of opinion that this is not the true construction of the statute, and that this being so the verdict was not against the weight of the evidence.

This statute appears as early as the Revision of 1702. It then provided that the person who should knowingly receive any stolen goods "shall be punished, as he, or they that commit the theft." Rev. 1702 (ed. 1718), p. 11. In the Revision of 1784, the words "shall be punished, as he, or they that commit the theft," were left out, and the following words subtituted therefor: "shall and may be proceeded against as principals, although the person or persons who committed the theft be not thereof convicted; any law, usage or custom to the contrary notwithstanding." Rev. 1784, p. 245. In substantially this last form the Act appears in the Revisions of 1808, p. 648, and of 1821, p. 159. In 1830 the law was made to read as follows: "If any person shall receive and conceal any stolen goods, articles, or things, knowing them to be such, he may and shall be proceeded against as a principal, although the person or persons who committed the theft be not thereof convicted, and shall be tried before the same court, and punished in the same manner, as if he had been the principal, and shall also be liable to the owner or owners of said stolen goods, as the principal would be liable." Public Acts of 1830, Chap. 1, § 47. This Act remained substantially in this last form until 1875, when it was changed into the form in which it now appears in § 1450 of the General Statutes.

We think the plain intent of the legislature as manifested in this law is that one who knowingly receives and conceals stolen goods shall, as to prosecution and punishment, be treated just the same as if he had stolen goods of the value of those received and concealed; that he is to be regarded, for purposes of prosecution and punishment, as having stolen only that which he guiltily receives, neither more nor less.

He may be charged with the theft of such goods, and may be tried, convicted and punished as for stealing goods of the value of those received. In other words, the degree of his crime and the consequent extent of his punishment are to be measured by the value of the goods received, and not necessarily by the degree of guilt attaching to the actual thief who stole them.

Under our statute relating to mere theft, the value of the thing stolen measures the degree of the crime, and, under our statute relating to the guilty reception of stolen goods, we see no good reason why the value of the goods received should not ordinarily measure the guilt and fix the punishment of the receiver. Such a construction is a fair and reasonable one. It puts the State to no inconvenience or unnecessary expense, and it is just and fair to the accused. He is punished for his own act, and according to the degree of his own guilt, measured by the value of the goods he receives, just as the thief is punished according to the value of the property he steals; and no good reason can be given why the guilt of the receiver must necessarily, and under all circumstances, be the same as that of the thief. This statute has heretofore been under consideration in this court in the two cases of *State* v. *Weston*, 9 Conn. 527, and *State* v. *Ward*, 49 id. 429; but the point made by the accused here was not raised in either of them. The construction here given to the statute is not inconsistent with those two decisions.

The construction contended for by the accused would or might lead to some singular results. Under it if *A* by a number of petty thefts accumulates in his possession one hundred dollars worth of stolen property, and then *B*, at one time and as one transaction, knowingly receives and conceals the whole of the stolen property, *B* can only be prosecuted and punished as for a number of petty thefts, each as to its degree of guilt being dependent on the precise amount stolen by *A* at some one time. This is the precise claim made in the present case. Again, under such construction, if *A* steals one hundred dollars worth of goods at one time and as one theft, and *B* knowingly receives and conceals one dollars

State *v.* Kaplan.

worth of the stolen goods, *B* is to be prosecuted and punished as if he had stolen one hundred dollars worth of goods. A construction that leads or may lead to such results ought not to be adopted if the statute is capable of any other.

On the whole we are satisfied that the construction we have put upon the statute is the correct one; and upon such a construction the verdict rendered in this case, even if we concede that the facts are as claimed by the accused, is not clearly nor manifestly against the weight of the evidence.

There is no error and a new trial is denied.

In this opinion the other judges concurred, except HAMERSLEY, J.

HAMERSLEY, J. (dissenting). A careful consideration of the Act of 1702, in its relation to our law and the English law as it then was, convinces me that in punishing one who conceals a theft, or one who knowingly receives stolen goods, "as he or they that commit the theft," the Act referred to the concealment of a particular theft perpetrated by a particular person, and to the receiving of any goods which had been obtained by such particular theft; the concealer or receiver became a participant in the particular crime of the thief, and subject to the same penalty. The whole theory of this Act, as well as that of the English statutes subsequently enacted, bases the guilt of the receiver, not upon a supposititious theft committed by him at the time of receiving the goods, but upon his participation in a theft already committed; therefore he is punished "as he that commits the theft."

In 1702 and thereafter until 1830, the main punishment of theft consisted in the forfeiture of treble the value of the goods stolen, and this forfeiture was enforced (until about 1821) by selling the thief into slavery. So far as the main punishment was concerned, it was practically immaterial whether the receiver was punished as for ten thefts of ten dollars each, or one theft of one hundred dollars. In 1830 the main punishment of theft was changed to imprisonment in jail and state prison, and arbitrarily graded in accordance

with certain maximum values of the property stolen. But this did not alter the law of 1702, so far as it defined the offense of receiving stolen goods. It is conceded by all that the meaning of that law is now substantially the same as when it was first enacted. It may be altered by the legislature if deemed desirable; I do not think the change should be made by judicial construction.

The trial court, however, did not err in refusing to grant a new trial for verdict against evidence.

The jury might, not unreasonably, have found from the testimony and inferences they might properly draw, the following facts: The prisoner, Cohen and Fontaine, agreed between themselves to steal a quantity of copper; the theft to be accomplished by the removal, from the factory of the Seymour Manufacturing Company, of a few ingots at a time to a place of concealment and, after a sufficient quantity had thus been accumulated, by carrying the whole away to be sold in bulk; Fontaine removed the copper at different times to his cellar near the factory. When thirty ingots had been so obtained, the prisoner, Cohen and Fontaine took all the copper from the cellar and put it in a wagon to be carried away and sold; the prisoner and Cohen sold the copper so carried off; each shared in the proceeds of the sale; the acts of each were in pursuance and execution of the agreement by all to steal this copper.

Upon this state of facts the law is so that the act of each in the prosecution of the agreement to steal, is the act of all. *State* v. *Allen*, 47 Conn. 121, 138. Each taking and carrying away of a portion of the copper by Fontaine was a theft by all of that portion. I think the taking and carrying away of the thirty ingots was also a theft by all of the whole. It must be conceded upon the state of facts assumed, that the prisoner as well as each of his confederates took and carried away the thirty ingots against the will of the owner, with intent to deprive him of that property. But the counsel for the prisoner urges that this is not theft of the whole, because the property, being in the possession of the thief as the result of prior thefts, there was no trespass in the appropriation of the

whole, and that without trespass there can be no theft. This saying is common, but the more accurate statement, as found in Hale, Hawkins and the early cases is, that without trespass there is no felony. Theft could not be prosecuted and punished as a felony, without a trespass, which was an essential element of every felony. In England, before the innovations of the Norman court, theft was closely associated with the notion of a forcible invasion of the actual possession of the owner. Cattle constituted the main part of personal property, and gave the name to that kind of property. The ideas of ownership and possession were vague. Cattle-lifting was the principal mode of committing theft, and so the crime was commonly in fact, although not of necessity, accompanied by force. Bracton wrote before theft was fully established as a felony to be prosecuted in the King's Court; he defined theft "*secundum leges*," that is, according to law books or compilations that endeavored to state the laws of Edward, but his definition was given in the language and influenced by the spirit of the Roman law. This clearly appears in comparing the passage in Bracton (Lib. iii, C. 32) with Just. iv. Tit. I, par. 1–10. Bracton's "*contrectatio fraudulenta*" was broader than a mere "taking;" his "*invito illo domino*" involved more than a breach of actual possession; and he emphasizes the "*animo furandi*" as the essence of the wrong: "*sine animo furandi non committitur*," following Justinian (*supra*, par. 7) whose "*sine affectu furandi non committitur*" is taken from Gai. iii, par. 197, "*sine dolo malo non committitur*." This definition has always been regarded as expressing the true conception of theft. Subsequently, when the law provided that the crime could only be prosecuted as a felony, the trespass necessary to a felony became necessary to its prosecution. And the use of "*latrocineum*" rather than "*furtum*" or its equivalent, in the designation of the new felony, indicates the dominant idea of a trespass consisting of a forceful invasion of actual possession. But in course of time it became evident that such a limitation of the real scope of the crime of theft was practically untenable.

As the majority of the court have decided this case on a

wholly different ground, and have, therefore, deemed it unnecessary to consider the question, I wish to suggest my reasons for affirming the action of the trial court, as briefly as possible, and I do not go into a detailed discussion of the cases which demonstrate the modification of the early theory of trespass. The theory that theft cannot be committed in respect to property in the actual possession of the thief, was found impracticable, and abandoned. This is fully illustrated in the cases that find a trespass in picking up lost property; a trespass in the fraudulent use of property which first comes into one's possession by lawful bailment, or where actual possession is acquired by fraud; a trespass in the continued or each new fraudulent dealing with property in one's possession by means of a former theft. This modification of the early notion of trespass in reference to theft is practically a modification of the theory that theft cannot be committed in respect to any property in one's actual possession.

When theft was made a felony, the forcible invasion of possession which was the usual attendant of the crime, but not necessarily of its essence, as is indicated in the definition of Bracton, became an essential ingredient of the crime, not because it was theft, but because it was felony; and for this reason the offense could not be committed by a possessor. In process of time, as personal property increased in importance and variety, it became clear that theft was in fact frequently committed by a possessor, and must be punished; and so certain acts of appropriation which violated no actual possession of the owner were punished as theft. It is impracticable and is not material to trace, through centuries of unpublished cases, how the crime of theft forced a recognition of its real nature in spite of the limitations of procedure involved in making it a felony. It is still true that theft is ordinarily attended by a breach of actual possession, but it is also true that it may, not infrequently, be committed by an actual possessor of another's property. If such possession result from contract, an appropriation may be a mere breach of trust, or may be punishable as theft only under the statutes of embezzlement; but if possession is ob-

tained from the owner through fraud or without the consent implied in contract, an appropriation may have all the characteristics of theft, and then the earmark of a felony which consists in trespass is supplied through the theory of constructive possession and implied taking.

Theft is complete with a fraudulent dealing coupled with the necessary criminal intent; a final disposition of the property may be evidence of theft but is not essential to its commission. Theft, therefore, may be in a certain way a continuing crime, that is, property once taken into the possession of the thief may be the subject of further fraudulent dealing and so of repeated theft. Whenever there is a union at one time of a taking or fraudulent dealing with the property of another against his will, with an intent to deprive him of that property, theft may he committed. And for this reason, if a thief takes several articles and removes them a short distance for convenience in carrying away, a theft is committed as to each article as soon as it is moved at all, and a theft is also complete as to the whole when they are carried off; and so long as the property remains in the possession of the thief, a new theft may be committed with each new fraudulent dealing, united with the other elements of the crime. Theoretically this may be true of each moment of continued possession, yet practically such continuous theft remains in every respect one and the same crime; but if there be some new fraudulent dealing, such as the conveyance of the whole or a portion of the property to another jurisdiction, or the putting together of a number of things for the purpose of disposing of the whole, united with the necessary criminal intent, there is a new theft as to the particular property so dealt with. The State may then select for prosecution such act of theft as may best serve the ends of justice. In any case of theft there must be some act of fraudulent dealing or taking or implied taking, *i. e.* a separation or disposition of particular property by moving, controling, concealing, or otherwise, for the purpose and with the intent of depriving the owner of the same against his will. It is this union of act and intent in respect to a particular

thing in the actual possession of the thief, as well as the difference in the mode of obtaining possession, that distinguishes such theft from the very similar crime of embezzlement, which latter ordinarily involves an actual and final disposition of the property.

The prisoner and his confederates, therefore, when they carried off the thirty ingots of copper, were guilty of a theft of the whole, notwithstanding they were also guilty of a theft of each parcel at the time it was first taken from its owner. Of course they should not be punished both for the separate thefts and the final theft, to which the prior ones in a way contributed; but the option as to the prosecution rested with the State's Attorney and not with the prisoner.

For these reasons I think there is no error in the judgment of the Superior Court.