STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
GEORGE D. MILLS, DEFENDANT-APPELLANT.

Argued November 21, 1967—Decided March 4, 1968.

*Mr. Gregory J. Castano,* Assistant County Prosecutor, argued the cause for respondent (*Mr. James A. Tumulty, Jr.,* County Prosecutor of Hudson County, attorney).

*Mr. Eugene P. Kenny* argued the cause for appellant.

The opinion of the court was delivered by

HANEMAN, J. Defendant appeals from a judgment of guilty with a recommendation of life imprisonment on each of three indictments charging felony murder and from sentences of three concurrent life terms entered upon the convictions.

The testimony at the trial discloses that at approximately 1:45 A. M. on May 23, 1964 a fire swept through the kitchen of the home of Joseph Carlin at 226 Laurel Avenue, Kearny, N. J. The fire resulted in the deaths of the three Carlin children — Daniel-14 years of age, Patricia-13, and Kathleen-10. Neither the mother nor the father was at home at the time of the conflagration. Both Mr. and Mrs. Carlin had jobs in Eagan's Restaurant in North Arlington, a short distance from their home. On May 22, 1964 Mrs. Carlin, having worked the luncheon shift, returned home after some shopping to prepare supper for the children. When the children were fed she left a sandwich on the kitchen table for her husband; cleaned the supper dishes and kitchen utensils; and left at about ten minutes to five to return to Eagan's to work from 5 P. M. to 2 A. M. She testified that when she departed from the Laurel Avenue home, the refrigerator was the only electric appliance plugged in; there was nothing on the stove; and the kitchen was tidy.

Mr. Carlin who had regular employment with the Prudential Insurance Company in Newark, worked part time as a bus boy at Eagan's Restaurant. On May 22, 1964, he arrived home from Newark at 5 P. M. He ate the sandwich

theretofore prepared by his wife; changed his clothes; and drove to Eagan's where he worked until 8:30 P. M. He had his supper and a couple of glasses of beer and drove home where he watched television with his daughters. His son Daniel was not home, being in attendance at a dance. Some time before 10:30 P. M. he began to feel tired and, fearing that he would not remain awake in order to pick his wife up upon the completion of her work, he went to a nearby tavern. At the tavern, Mr. Carlin played pool until about one o'clock at which time he was driven home by a friend. He found his son, who had returned from the dance, sleeping in his bedroom. The two girls were asleep in the room they shared. He checked the kitchen and TV room and found nothing unusual. He then left the house at 1:15 A. M. arriving at Eagan's at 1:25 A. M. The Kearny Fire Department received a call at 1:43 A. M. notifying them of a fire at the Carlins' home. At 1:50 A. M. Mr. and Mrs. Carlin were advised at Eagan's that their house was on fire.

When the firemen arrived at 226 Laurel Avenue at about 1:45 A. M. they found flames lapping out of the kitchen windows which had been blown out by the fire. Although the fire was largely confined to the kitchen the heat was so intense that the fire fighters at first could not gain entrance to the kitchen. The temperature was so high that a member of the rescue team could feel heat through his steel innersoled boots. Within three or four minutes of arrival most of the flames had been extinguished.

The girls were discovered dead in their bedroom. The boy was found badly burned, behind the front door. He died on May 29, 1964.

On May 23, 1964, defendant, an army veteran who had left school in the ninth grade, was 26 years of age. He, with a partner, operated a Sunoco gasoline service station located about 150 feet from the Carlin house. On the day in question, he opened the station at 7:00 A. M. and finished work around 3:30 P. M. He then went home and changed into a fresh Sunoco uniform — blue slacks and blue shirt. He

proceeded to take a ride in his white Impala convertible, stopping at a Jersey City bar where he drank a few beers and shot pool for about an hour and three-quarters. He then went to the Midland Bar in Kearny, where he continued drinking beer and shooting pool until 6:30 P. M. At about 7:00 P. M. he arrived at the Ulster Club in Kearny where he stayed until some time after midnight.

According to his account, he was drinking beer the entire time with an occasional scotch. He was finally asked to leave the Ulster Club for making a fool of himself. Other defense witnesses testified that he was drunk when ejected from the Ulster Club at or about midnight. He then drove to his gas station and picked up his dog. From the station he went to the Snug Harbor Tavern, where he drank until just after 1:00 A. M. The bartender at the Snug Harbor Tavern testified that he was not intoxicated at one or one-fifteen A. M. when he left that tavern.

Up to this point there is not too much conflict between the State's and defendant's stories. The next portion of defendant's story, however, is diametrically opposed to that of the prosecution. He claims that he drove back to the gas station and decided to walk his dog around the block; he spotted flames while passing the Carlin house; ran to both the rear and front door and was unable to enter; he then ran to the gas station and turned in the alarm before returning to the scene of the fire.

The State, on the other hand, adduced the following testimony: A neighbor who lives directly across the street from the Carlins, a Mrs. Elizabeth O'Reilly, testified that at 1:30 A. M. while looking out of her living room window, she saw a white convertible pull up and park in front of her house. Defendant admittedly was driving a white Impala on the night in question. An unidentifiable male figure who was wearing a short-sleeved tan shirt, open at the collar, and dark trousers, got out of the car, crossed the street, ascended the Carlin porch, and tried the front door; he then came down the steps and disappeared onto the driveway alongside

the Carlin house. After about five minutes he reappeared and got back in the car. The man smoked for about a minute and then made a U-turn, parking in front of the Carlin house. He got out of the car and walked up and down the sidewalk in front of the house for a minute or two. The figure then went into a neighbor's yard, looking up toward the back of the Carlin house. He suddenly hurried to his car, got in, and sped over to the corner gas station — turning in there. Mrs. O'Reilly immediately saw flames; she crossed the street, and stood ringing the Carlin doorbell. Shortly thereafter, a man came up and asked "what happened". This man was wearing a tan shirt and Mrs. O'Reilly identified him as the man who worked in the corner gas station — the defendant, George D. Mills. According to Mrs. O'Reilly, defendant was greatly intoxicated and looked hysterical.

Another neighbor, Mrs. Patricia Symanski, testified that at about 1:00 A. M. she saw a white car park in front of Mrs. O'Reilly's and remain there for a couple of minutes. She noted that Mr. Carlin returned home about 1:05 A. M., remained talking in a car for approximately ten minutes and then went into the house for about five or ten minutes before driving away at about 1:20 A. M. After Mr. Carlin left, a white Chevrolet pulled up and parked in front of Mrs. O'Reilly's at about 1:30 A. M. Mrs. Symanski was watching television and did not notice anything further until the car made a U-turn and parked on Laurel Avenue, by the Carlin driveway. She then saw a man, whom she positively identified as defendant Mills, get out of the car. Defendant walked up and down the sidewalk, looking at the Carlin home; according to Mrs. Symanski, he was wearing a light jacket, closed at the top, and dark trousers. Defendant then got into his car and drove to the gas station at the corner. Mrs. Symanski saw flames and sparks coming out of the Carlin house almost immediately and ran to call the Fire Department.

While viewing the fire, another witness, Mrs. Ann Baumgartner, saw defendant standing in the Carlin driveway.

According to her testimony, defendant was not drunk and she could detect no odor of liquor on his breath. He was wearing a "beige windjammer — a jacket with a zipper" — which was open and not zippered.

Mr. Anthony Krazniewski, a grave digger in the cemetery where the three children were buried, reported seeing defendant on two occasions. One week after the burial, a man whom he identified as defendant went to the graves, knelt, and stayed for five or ten minutes. This person muttered, "Kathy, Kathy, Kathy" — the name of one of the victims. Two weeks after the funeral, the same person made a similar visit.

Four written statements of defendant were introduced by the State. Two were non-inculpatory and defendant raised no objection to their admission. The other two, to the admission of which defendant objected, although not amounting to confessions of the commission of a crime, admit that defendant did enter the kitchen of the Carlin house through an unlocked rear door. Mills therein stated that after lighting a cigarette he flipped the match to the floor which burst into a blaze.

Upon defendant's request at the Kearny Police Station on July 1, 1964 for permission to consult a clergyman, he was visited by the Rev. Albert L. Beemer who testified that the defendant in his presence said to defendant's wife, between sobs, "You know that fire on Laurel Avenue. I did it."

The State presented three expert witnesses, all of whom concluded that the fire was of incendiary origin and that a propellant or accelerant had been used. These experts ruled out other possible causes of the fire, and based their conclusion of incendiarism primarily upon the tremendous intensity which the fire achieved in a relatively short space of time.

The defendant denied the State's theory that a propellant or accelerant was employed and advanced three alternate theories in an attempt to explain the origin of the fire: (1) the fire was started in the ceiling of the kitchen by defective electric wiring; or (2) the fire was started when some gas,

which escaped from the range across the kitchen, drifted behind the refrigerator and was ignited by a spark from the refrigerator, or (3) the fire was started behind the refrigerator by a defective plug.

The defendant advances the following arguments in seeking a reversal of the convictions:

1. Defendant's statements should not have been admitted into evidence.

2. Defendant was denied due process of law by the Prosecutor's tactics during the trial.

3. The trial court improperly admitted testimony concerning the white Impala convertible.

4. The trial court erred in admitting testimony that the defendant visited the grave of the fire victim.

5. The trial court improperly excluded testimony concerning the olfactory capacity of Mr. Carlin on the night in question.

6. There was insufficient evidence of the incendiary nature of the fire to support the verdict of the jury.

7. The trial court improperly refused to strike responses to hypothetical questions where those responses allegedly incorporated hearsay information.

8. The imposition of three life sentences was invalid.

We shall treat of defendant's alleged grounds for reversal in the foregoing order.

I

*Was it error to have admitted defendant's statements into evidence?*

The two statements to which defendant objects were obtained (1) by Sergeant Louis Jasmine of the New Jersey State Police and (2) by Detective Black and Lieutenant Conn of the Kearny Police.

Defendant argues that these statements should have been excluded because he was not effectively advised of his constitutional rights to remain silent and to have the assistance of counsel. Since the trial commenced in February, 1966

before the decision in *Miranda v. State of Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed. 2d* 694 (1966), he bases his claim to exclusion solely on *Escobedo v. State of Illinois,* 378 *U. S.* 478, 84*A S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964). See *Johnson v. State of New Jersey,* 384 *U. S.* 719, 86 *S. Ct.* 1772, 16 *L. Ed. 2d* 882 (1966).

■ The State's and defendant's versions of what transpired at the time the statements were made, are diametrically opposed. However, we have fully reviewed and weighed all the evidence on the question of the admissibility of the statements and find that the trial court was correct in holding that the statements were voluntary. *State v. Smith,* 32 *N. J.* 501, 549 (1960). Moreover, defendant did not request a lawyer and therefore cannot complain. *State v. Ordog,* 45 *N. J.* 347 (1965).

## II

*Was defendant denied due process of law by the Prosecutor's tactics during the trial?*

■ Defendant directs this attack particularly to the nature of the Prosecutor's objections to the admission of evidence. The record discloses that the trial was sharply contested and the conduct of both counsel at times bordered on the edge of wrangling, frequently initiated and stimulated by the conduct of defendant's counsel. The trial court exhibited commendable restraint and so conducted the trial that it cannot be said that the State struck the defense any foul blows. In spite of the tense atmosphere of the trial, the record discloses that the Prosecutor's conduct did not exceed the bounds of fair play. See *State v. D'Ippolito,* 19 *N. J.* 540 (1955). We find no merit in defendant's point.

## III

*Did the trial court improperly admit testimony concerning the white Impala convertible?*

 We find no error in this admission. Only a small percentage of the population own and drive white Impalas. Thus it was a legitimate portion of proof of defendant's presence in the vicinity of the fire to show that he owned such a car and that it was in the immediate neighborhood directly prior to the conflagration. The proof that there were three or four other automobiles of a similar nature in the locality was to defendant's advantage as it permitted the inference that someone other than defendant could have been watching the Carlin house.

## IV

*Did the trial court err in admitting testimony that the defendant visited the grave of the fire victim?*

Anthony Krazniewski, a grave digger in the cemetery where the Carlin children were buried, testified that on the Saturday following the burial of the children, defendant came to the cemetery in a white automobile. He asked to be directed to the grave where the girls were buried. He knelt at the grave and repeated "Kathy, Kathy, Kathy".

 The conduct of a defendant subsequent to the commission of a crime is relevant when the conduct in question indicates a consciousness of guilt. 1 *Wharton, Criminal Evidence* (*12th ed.* 1955) *p.* 404; 2 *Warren on Homicide* § 215 (1961 *Supp.*) Unusual exhibitions of remorse for the victims of a crime may in some circumstances be probative of the guilty conscience of a party. *Cf. State v. Crivelli,* 89 *N. J. L.* 259 (*E. & A.* 1916) ; *State v. Cerce,* 22 *N. J.* 236 (1956). Here, the jury could have found that defendant's acquaintance with the deceased children would not have explained his trip to the cemetery or his deep expression of grief.

We discern no error in the admission of the evidence.

## V

*Did the court improperly exclude testimony concerning the olfactory ability of Mr. Carlin?*

Defendant argues that the court erred in sustaining an objection to defense counsel's cross-examination of one of the State's experts in which he sought to elicit an opinion concerning the "deadening" effect upon one's olfactory ability, of alcoholic consumption in a "smoke laden" tavern on a Friday night. The purpose of the line of cross-examination was to cast doubt upon Mr. Carlin's ability to detect smoke in the kitchen of his home when he returned after several hours in a tavern. The answer lies first, in the fact that there was no evidence of the "smoke" condition of the tavern – i.e., whether there was much, little or no smoke; second, in the fact that the expert claimed no knowledge or skill in this area; and third, in the absence of any proof concerning the effect of alcohol on the sense of smell. We find no merit to this argument.

## VI

*Was there sufficient evidence of the incendiary nature of the fire to sustain a verdict?*

Defendant argues that in a criminal case, relying upon circumstantial evidence, to warrant a conviction, "the circumstances must exclude every reasonable hypothesis except that the respondent is guilty". The short answer to that argument is found in the proper test which is "in weighing circumstantial evidence to determine if guilt exists as in the case of direct or testimonial evidence, namely, whether it is sufficient to generate a belief of guilt beyond a reasonable doubt". *State v. Ray,* 43 *N. J.* 19 (1964).

The conclusion that Mills started the fire is corroborated by the Rev. Beemer's testimony of Mills' admission thereof to his wife. With this fact established the question then is whether the fire was accidentally or intentionally started. The pre-trial admission of defendant that the fire originated from his carelessly tossed match is contradictory of his trial advanced theory that the conflagration was initiated by a fire in the ceiling or wall from a cause with which

he had no connection. For the fire to have thus started from either or both causes simultaneously is a coincidence which strains believability. Far more believable than the tossed match or ceiling or wall theories, is that advanced by the experts, *i.e.,* the fire could not have reached its terrific intensity in the short period of time here involved without the use of accelerants and hence was not of an accidental nature. This testimony coupled with defendant's admitted unexplained presence in the kitchen at the inception of the conflagration, when weighed against defendant's unlikely theories, furnish ample believable testimony to generate a belief beyond a reasonable doubt of defendant's guilt.

## VII

*Did trial court improperly refuse to strike responses to hypothetical questions where those responses allegedly incorporated hearsay information?*

Defendant here directs his attack to the testimony of one of the State's experts, Chief Drew of the Newark Fire Department. After cross-examination, the defense moved to strike Drew's answer to the hypothetical question on the ground that the opinion was based at least in part on hearsay not set forth in the hypothetical question. A reading of the entire Drew testimony leads to the conviction that he stated that his "initial" conclusion as to the cause of the fire was based upon his personal inspection of the premises and conversation with firemen who fought the fire. He did not state that the opinion he voiced in court was based upon any facts other than those recited in the hypothetical question. To the contrary the effect of his testimony was that he bottomed his conclusion on the facts contained in the hypothetical question. In the light thereof, the court's refusal to strike was justified.

## VIII

*Did the court err in imposing three concurrent life sentences?*

In the past New Jersey has resolved questions of this sort by resort to two tests, *i.e.,* (1) "single transaction" test or (2) "same evidence" test. If the separate convictions arise out of a single transaction only one sentence may be imposed. *State v. Mowser,* 92 *N. J. L.* 474 (*E. & A.* 1919); *State v. Hoag,* 21 *N. J.* 496 (1956) (minority opinion), affirmed 356 *U. S.* 464, 78 *S. Ct.* 829, 2 *L. Ed. 2d* 913 (1958); *State v. Greely,* 30 *N. J. Super.* 180 (*Hudson Cty. Ct.* 1954) affirmed 31 *N. J. Super.* 542 (*App. Div.* 1954); *State v. Pennsylvania R. R. Co.,* 9 *N. J.* 194 (1952). Also, where the evidence necessary to sustain one conviction is identical to that needed to sustain the other only one sentence may be imposed. *State v. Hoag, supra,* 21 *N. J.,* at *p.* 502; *State v. DiGiosia,* 3 *N. J.* 413 (1950).

We need not be here concerned with which is the correct test if indeed one may speak of a "correct test" at all, see *State v. Currie,* 41 *N. J.* 531, *pp.* 537–9 (1964) since obviously the three deaths here resulted from but one criminal transaction — *i.e.,* one act of arson — and the proof necessary to convict defendant of one of the homicides would not vary from that needed to convict on either of the other two. The imposition of three sentences — even though to run concurrently — is therefore improper. See *State v. Pennsylvania R. R. Co., supra,* 9 *N. J.,* at 194.

When more than one sentence has been imposed where only a single sentence was proper, relief from the improper sentence has been variously granted. In *People v. Lyons,* 50 *Cal. 2d* 245, 324 *P. 2d* 556 (1958) the California Supreme Court was faced with determining the correct procedure to be applied to an appellant who had been convicted on two counts of receiving stolen property and sentenced to concurrent terms. The court determined that only one sentence was proper and concluded:

"In a situation such as this, if any substantial objective of justice would be served thereby, this court could reverse [both judgments], order such counts consolidated, and remand the cause for rearraignment of the defendant for sentence and for sentence on the consolidated

count. Inasmuch, however, as it does not appear that here either the state or the defendant will be prejudiced by a simple reversal as to one count and affirmance as to the other, and as finality of adjudication will thereby be expedited, we conclude that the latter procedure is the more desirable." (324 *P. 2d*, at *p.* 573)

See also *State v. Schlenger,* 13 *Ill. 2d* 63, 147 *N. E. 2d* 316 (*Sup. Ct. Ill.* 1958)

Other jurisdictions have achieved the same result by applying other rationales. For example in *O'Keith v. United States,* 158 *F. 2d* 591 (5 *Cir.* 1946) the court merely ordered the additional sentence expunged, while in *Green v. United States,* 274 *F. 2d* 59 (1 *Cir.* 1960) affirmed 365 *U. S.* 301, 81 *S. Ct.* 653, 5 *L. Ed. 2d* 670 (1961), rehearing denied 365 *U. S.* 890, 81 *S. Ct.* 1024, 6 *L. Ed. 2d* 201 (1961), the court refused to grant a defendant the "paper satisfaction (for which he has not asked) of having the sentences under Counts 1 and 2 vacated leaving him only with the single sentence under Count 3". The court treated the impropriety of the sentences as a "technical matter" and refused to correct it on the grounds that the defendant had not been harmed.

It is obvious in the present case that defendant has not been prejudiced by the imposition of three concurrent life sentences. The three sentences shall be deemed, for all purposes, as one sentence imposed on a single conviction.

Affirmed and modified consistent with the foregoing.

*For affirmance and modification* — Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, GOLDMANN, SCHETTINO and HANEMAN — 6.

*For reversal* — None.