STATE OF CONNECTICUT *v.* PAUL MOYNAHAN

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued January 3—decided April 5, 1973

*Edward F. Hennessey,* with whom was *James A. Wade,* for the appellant (defendant).

*Dennis F. Gaffney,* special assistant state's attorney, for the appellee (state).

LOISELLE, J.  The defendant, the deputy superintendent of the Waterbury police department, was found guilty by a jury of the crime of receiving stolen goods in violation of General Statutes § 53-65. He has appealed from the judgment rendered on the verdict, assigning thirty-two errors.  All of the claimed errors have been considered but no useful purpose would be served by a lengthy discussion of each assignment of error.  Many of the issues raised by the defendant have been previously determined by this court and are well established by precedent in our law.  Only those issues, therefore, which merit comment are discussed.

The defendant in his assignment of errors attacks the court's (*Barber, J.*) denial of his motion to quash, his motion for change of venue, and his motion to dismiss on the ground that the state's attorney is appointed by the judges of the Superior Court and, hence, unconstitutionally appointed.  The defendant further claims that the inquiry under General Statutes § 54-47 was unconstitutional; that the warrant was issued without probable cause; and that the court erred in its denial of the defendant's motion to dismiss based on a claim that the state's attorney did not provide exculpatory information as ordered by the court.  All of these motions were made before trial.

## I

The motion to quash alleged that Wayne Bishop, a captain in the state police, was present at an investigatory inquiry held under § 54-47[1] on May 6, 1969, and the finding and both appendices reveal that Captain Bishop was in fact present.  The mo-

[1] Although described in the vernacular as a "one man grand jury," the correct designation for a proceeding under § 54-47 is "investigatory inquiry."

tion alleged that Captain Bishop's presence was illegal and that he "further participated illegally in said hearings as he acted as an attorney propounding questions to the witnesses." There is nothing in the record or the appendices to substantiate this latter claim. In fact, Captain Bishop's testimony narrated in the state's appendix to its brief is to the contrary.

While the record is devoid of an order for an inquiry under § 54-47, it is evident that an inquiry was in fact conducted by former Chief Justice O'Sullivan, a state referee, and that evidence taken at that inquiry was used against the accused by the state through the testimony of Captain Bishop. The defendant limits his argument in his brief to the claim that the presence of Captain Bishop at the investigatory inquiry was a violation of § 54-47.

General Statutes § 54-47, enacted in 1941, provides for a one-man investigation significantly different from the constitutional grand jury empowered to indict under General Statutes § 54-45. Since *Lung's Case,* 1 Conn. 428, the proceedings under § 54-45 have been uniform by rule of court. It is clear that § 54-47 affords a greater informality and a more broadly based scope of inquiry than that of a constitutional grand jury with power of indictment. The investigatory inquiry can be private or public, witnesses may be questioned by the judge, the referee, the state's attorney, the assistant state's attorney or any other attorney appointed for that purpose and the report made to the Superior Court by the judge or the referee may be made public. Anyone accused of a crime as a result of such inquiry is guaranteed access to the transcript of his own testimony. Furthermore, there is no restriction placed by statute on the presence of any person at

the inquiry. The modern investigatory inquiry authorized by § 54-47 in its functions is similar to the general investigatory grand jury known to common law which could inquire into crimes. *State* v. *Menillo*, 159 Conn. 264, 273, 268 A.2d 667. There remains, however, one essential difference which distinguishes the investigatory inquiry from the common-law investigatory grand jury. Under § 54-47 the judge or referee who conducts the inquiry has no power or authority to issue an indictment. His sole function is to investigate and report his findings to the court. The court has the option of making the information garnered by the inquiry available to the state's attorney but this decision under § 54-47 rests with the court, not the investigating officer. The latitude afforded the judge or referee under the statute is designed to ensure that the proceeding is conducted in an orderly and expeditious manner. To that end, it was proper for the referee conducting the investigation to utilize whatever assistance he deemed necessary, including the presence of the officer who originally was charged with the investigation prior to a court-ordered inquiry.

The final motion to dismiss submitted prior to trial is divided into three parts, of which only two are briefed. Our discussion is limited to those portions of the motion which were briefed. The motion to dismiss attacks § 54-47 as unconstitutional on its face because of a lack of minimum standards of due process. The defendant's principal claims are that the report can be made public, that counsel are precluded from attendance, and the right of confrontation and of cross-examination is denied a witness. The defendant relies principally on *Jenkins* v. *McKeithen*, 395 U.S. 411, 89 S. Ct. 1843, 23 L. Ed. 2d

404. That case, however, is inapposite to the present matter. The Supreme Court in *Jenkins* v. *McKeithen,* supra, 431, found that the function of the commission under attack was "to make specific findings of guilt, not merely to investigate and recommend." It specially held that "the commission exercised a function very much akin to making an official adjudication of criminal culpability." The Supreme Court in the *Jenkins* case reaffirmed *Hannah* v. *Larche,* 363 U.S. 420, 80 S. Ct. 1502, 4 L. Ed. 2d 1307. The *Hannah* case, supra, 441–42, had held that in a purely investigatory inquiry by a body appointed or created for that purpose alone the rights of apprisal, confrontation, or cross-examination of witnesses were not constitutionally required by the due process clause. The inquiry under § 54-47 is made by an independent judicial officer and is investigatory and nonadjudicative. An inquiry is conducted and a report is made to the court. The inquiry has no other purpose or function and therefore does not violate the defendant's due process rights. *Salvaggio* v. *Cotter,* 324 F. Sup. 681 (D. Conn.), aff'd, 447 F.2d 1406; see also *Puglia* v. *Cotter,* 333 F. Sup. 940 (D. Conn.), cert. denied, 405 U.S. 1073, 92 S. Ct. 492, 31 L. Ed. 2d 806, aff'd, 450 F.2d 1362. The further claim that the inquiry is a critical stage of a proceeding requiring the presence of counsel under the *Miranda* rule is without merit. The inquiry is investigatory and cannot be described as custodial where "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694.

The investigation in this case was conducted in private. The defendant's claims of prejudicial dis-

closure are merely conjectural; see *Jenkins* v. *McKeithen,* supra, 427; and adequate remedies were available to provide timely safeguards against publication of the findings. *Kennedy* v. *Justice of District Court,* 356 Mass. 367, 252 N.E.2d 201. Furthermore, it is clear that this investigation was not an accusatorial or adjudicative process but was simply investigatory in design and operation. Section 54-47 did not deny the defendant due process guarantees and is not an unconstitutional exercise of legislative authority. Diligent inquiry to ferret out crime will not be frustrated or denied so long as due process safeguards are available to protect the rights of the parties affected.

The remaining part of the motion to dismiss attacks the appointment of the state's attorney by the Superior Court judges as a denial of due process guaranteed by both the federal and state constitutions. The basis of the defendant's argument is that the state's attorney exercises an executive function in prosecuting crimes and cannot constitutionally be appointed by the judicial department. Alternatively, the defendant contends that the exercise of this appointment power, if constitutionally valid, nevertheless violates principals of due process by interjecting the judiciary unnecessarily into the accusatorial system.

General Statutes § 51-175 directs that the appointment of the state's attorney be made by the judges of the Superior Court.

Under the constitution of the state of Connecticut, appointments, other than those whose mode is prescribed, are governed by the division of governmental powers. *State* v. *Stoddard,* 126 Conn. 623, 627, 13 A.2d 586; *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 586, 37 A. 1080. "Our own Constitution

like most constitutions, provides for certain elective and legislative appointments; but except in the cases specified, appointment to office is an exercise of executive power, unless used as a means appropriate to the exercise of power granted to another department; and when so used it is not the exercise of executive power within the meaning of the Constitution." *Norwalk Street Ry. Co.'s Appeal,* supra, 595.

In determining whether the appointment of a state's attorney by the judges of the Superior Court is a means appropriate to the exercise of the judicial power, a controlling consideration is the functional consistency of such an appointment with the duties and powers of the judicial department as distinct from those of the executive department.

The functions of a state's attorney are not purely those of an executive officer. As a representative of the people of the state, he is under a duty not solely to obtain convictions but, more importantly, (1) to determine that there is reasonable ground to proceed with a criminal charge; *State* v. *Hayes,* 127 Conn. 543, 581, 18 A.2d 895; (2) to see that impartial justice is done the guilty as well as the innocent; and (3) to ensure that all evidence tending to aid in the ascertaining of the truth be laid before the court, whether it be consistent with the contention of the prosecution that the accused is guilty. *State* v. *Harris,* 147 Conn. 589, 598, 164 A.2d 399; *State* v. *Zimnaruk,* 128 Conn. 124, 127, 20 A.2d 613.

The state's attorney, thus, is an officer charged with important duties and responsibilities in the administration of justice. Such duties of a state's attorney are entirely consistent with judicial power as prescribed by our constitution. *State* v. *Hayes,* supra.

This court in *Hopson's Appeal,* 65 Conn. 140, 146, 31 A. 531, held that when a function lies on the borderline of the division between executive and judicial power, the exercise of that power by the judiciary may be constitutionally valid and the practical construction of this exercise of power, both before and after the adoption of the constitution, may be safely accepted. The history of the statute authorizing judicial appointment of the state's attorney demonstrates a longstanding commitment to this practice.

Beginning in 1704 the assembly directed that the queen's attorneys (now the state's attorneys) be appointed by the county courts. "[T]he neglect of putting good lawes in execution against imoral offenders, that therefore such neglect may be prevented for the future: It is ordered and enacted by this Court [Assembly] that henceforth there shall be in every countie a sober, discreet and religious person appointed by the Countie Courts to be Atturney for the Queen, to prosecute and implead in the lawe all criminall offenders, and to doe all other things necessary or convenient as an atturney to suppress vice and imorallitie." See 4 Col. Rec. 468. In 1730 this appointment procedure was continued. 7 Col. Rec. 280.

The revision of 1808, the last revision of the statute laws of the state of Connecticut prior to the adoption of our state constitution in 1818, directed that state's attorneys be appointed by the respective county courts. Statutes, 1808, p. 67, § 6. While the constitution was silent with regard to this issue, the first revision of the statute laws of the state of Connecticut in 1821[2] subsequent to the adoption of our

---

[2] The special committee appointed by the legislature to examine statute laws following the adoption of the constitution in 1818 re-

state constitution in 1818, also directed that state's attorneys be appointed by the respective county courts. Statutes, 1821, p. 141, § 22; see also 2 Swift, Digest, p. 369 (1823).

The practice of judicial appointment of state's attorneys has prevailed to the present time without interruption and, until recently, without disputation. The delegation of this appointment power to the courts since 1704 is, in accordance with the rule of *Hopson's Appeal,* supra, constitutionally valid and the appointment of state's attorneys by the judicial department is appropriate within the scope of the judicial power confided to the courts by the constitution. Exercise of that power is incident to legitimate judicial functions. The constitutionality of this grant of power was clearly recognized by this court in *Adams* v. *Rubinow,* 157 Conn. 150, 163 n., 251 A.2d 49, and is no longer open to question.

The claim that the appointment of the state's attorney by the judiciary is foreign to the accusatorial system may be valid in some jurisdictions but in this state the system of judicial appointment of the state's attorney has functioned effectively for nearly 270 years with no prejudice to those accused of criminal offenses. The appointment of state's attorneys by the judiciary does not violate the defendant's due process rights guaranteed by the state and federal constitutions nor does it in any way diminish the salutary benefits of our accusatorial system.

ported in part as follows: "The difficulty of diffusing a general knowledge of a voluminous code, and the perplexity and confusion arising from an intermixture of laws in force and not in force, have induced the committee to omit all statutes, and parts of statutes, which have been directly repealed, or superseded by new provisions, or become obsolete by the change of manners and customs, or inconsistent with the sentiments of the age, or repugnant to the principles and spirit of the constitution." Statutes, 1821, p. viii.

The assignment of error directed to the court's denial of the motion for a change of venue is unsupported in the record or in the appendices to the briefs by any evidence of publicity likely to cause prejudice against the accused and consequently is not discussed.

The second motion to dismiss filed in November, 1969, alleged that the state's attorney did not provide defense counsel with all exculpatory material as previously ordered by the court. An examination of the record fails to disclose any merit to this claim. Similar motions made during the trial are discussed elsewhere in this opinion.

## II

The defendant's claims of error relating to the court's charge are tested by the claims of proof in the finding. *Robinson* v. *Faulkner,* 163 Conn. 365, 367, 306 A.2d 857; *Busko* v. *DeFilippo,* 162 Conn. 462, 464, 294 A.2d 510. The state made the following claims of proof: On April 6 or 7, 1967, John Bishop broke into the Martin Appliance Company store in the town of North Haven and stole two television sets, one of which was a twenty-two-inch Motorola maple console color TV valued at $527.90 wholesale and $639 retail. Bishop then transported these sets to the home of Charles Vernale, who paid Bishop $200 for each set. Late in April, or early in May, 1967, Bishop went to Vernale's home to collect payment for other TV sets he had delivered to Vernale. On that occasion, he and Vernale loaded the stolen Motorola set into Vernale's station wagon and then drove to the defendant's home. Bishop and Vernale carried the set into the defendant's living room and left it there. The defendant was present at the time. The defend-

ant was a regular visitor at Vernale's home. On one occasion in 1966, the defendant saw Bishop at Vernale's house and told Bishop: "I don't care what business dealings you and Charles have between you. That is your business, but if you ever do anything in Waterbury, I will have to nail you for it."

Edward Miller, a Waterbury television repairman, was called by the defendant to repair a color TV set on a Sunday in June, 1967. Miller repaired the set and was paid $15. In February, 1969, Miller told the state police that he had repaired a Motorola twenty-three-inch color television set, early American colonial, maple finish, for the defendant and that the repair consisted of soldering a wire within the sound coil, wrapping it with black tape and then replacing the sound coil in a metal shield which would render the repair not visible without opening the metal shield. On March 27, 1969, a television set was found in the town of Terryville, about six and one-eighth miles from the defendant's home. Although the set had been smashed, the serial number identified the set as the one stolen from the Martin Appliance Company. Miller was shown the set on April 1 and 2, 1969. He informed the state police that if they opened the metal shield over the coil they would find the black plastic tape he had used, which was not visible from the outside. On April 3, 1969, the state police examined the set and found that when the metal shield on the sound coil wire was removed, the sound coil did have black tape on it and had been soldered.

On February 9, 1969, the defendant was interviewed by the state's attorney and Captain Wayne Bishop of the state police (hereinafter referred to as Captain Bishop to distinguish him from John Bishop who is referred to as Bishop). The defend-

ant was advised that the questioning concerned Vernale and possible receipt of stolen goods by the defendant from Vernale. At this interview the defendant was advised of his rights and he waived his right to counsel and stated that in April, 1967, he knew that Vernale was receiving stolen goods; that Bishop was involved in breaking and entering and bringing goods to Vernale; that he would never take anything from Vernale because of his record, activities and reputation as a receiver of stolen goods; that he never had a color TV set before December, 1968; and that he probably should have warned his son about taking an air conditioner from Vernale.

On May 6, 1969, at the investigatory inquiry held by State Referee O'Sullivan with Captain Bishop present, the defendant stated he had had a twenty-three-inch color Motorola TV set previous to December, 1968, which had been given to him by Tony Caggiano, who was then deceased. The defendant further testified that he had met a television repairman at Vernale's home and that the repairman had repaired his set; that he knew that both Vernale and Bishop had criminal records; that he knew three stolen television sets were removed from Vernale's home in 1965; that he knew Vernale was receiving stolen goods from breaks occurring in places other than Waterbury and that Vernale was to call him if any of the merchandise was brought to Vernale; and that he was friendly with Vernale.

The defendant offered evidence to attack the credibility of John Bishop, who was then awaiting sentence for breaking and entering on about thirty to thirty-five outstanding warrants. He offered evidence attacking the credibility of Miller. This evidence involved inconsistent statements made by

Miller at different times and Miller's sale of two sets received from Vernale and the fact that the television set repairs were made by Miller for Vernale. The defendant testified that in his statement to Captain Bishop and the state's attorney he had denied receiving a television set from Vernale or knowing that Vernale was receiving stolen goods until sometime in 1968. The defendant also testified that he stated in the interview that Vernale was his informant from 1959 to 1968. The defendant offered evidence regarding his statement before the investigatory inquiry on May 6, 1969. He stated he had received a color TV set from Tony Caggiano in 1967 which was mahogany and not maple, and that it had been repaired by a man he had met at Vernale's home. He also stated that he was a subordinate of Detective Byrnes when some TV sets were found by them at Vernale's. The defendant introduced various witnesses who testified both as to his general reputation in the community for truth and veracity and for honesty and as to their own personal opinion as to his character traits. The facts claimed to have been proven by both the state and the defendant are more extensive than those presented but the recital above is sufficient to test the portions of the court's charge which the defendant claims were erroneous.

The defendant has briefed seven assignments of error directed to the charge of the court. The claim that the court erred in its charge that in weighing a witness' testimony the jury should consider the witness' interest, including the defendant's interest in the verdict, is without merit since the instruction was in accordance with our procedure and was proper. *State* v. *Guthridge,* 164 Conn. 145, 318 A.2d 87.

The court, in its charge, referred to the fact that Frank Maiola admitted that he gave false testimony with respect to a question asked of him by the state. The court cautioned the jury about considering the remainder of his testimony but told them the acceptance of his testimony or any part of it was for them to determine. It then stated: "This rule must be applied by you not only to the testimony of Frank Maiola, but also to the testimony given by any other witness who has appeared in court, including, of course, the testimony given by the defendant, Paul Moynahan, himself." The defendant excepted to this portion of the charge claiming the court picked out Maiola and the defendant by name and did not name three other witnesses who the defendant claimed gave contradictory statements. Maiola admitted that he consciously told an untruth under oath while testifying. No other such concession on the part of any witness has been established by either party. The charge was a guarded instruction on the maxim, falsus in uno, falsus in omnibus. *Willametz* v. *Guida-Seibert Dairy Co.,* 157 Conn. 295, 301, 254 A.2d 473; *Craney* v. *Donovan,* 92 Conn. 236, 246, 102 A. 640. Under such circumstances it was proper for the court to comment on this evidence. *State* v. *Cari,* 163 Conn. 174, 182, 303 A.2d 7; *State* v. *Tropiano,* 158 Conn. 412, 428, 262 A.2d 147, cert. denied, 398 U.S. 949, 90 S. Ct. 1866, 26 L. Ed. 2d 288; *State* v. *LaFountain,* 140 Conn. 613, 620, 103 A.2d 139. The inclusion of all other witnesses, including the defendant, by name to be affected by this rule was simply a caution to the jury that the rule applied to all witnesses who testified and did not place undue emphasis on the defendant's testimony by noting that the rule also applied to the defendant.

In the charge, the court commented on the state's claim that the defendant had made inconsistent statements. The court noted that the state had asserted that, under oath during the investigatory inquiry, the defendant had stated that he never had a color TV set in his home and during the trial he made a contradictory statement. The court charged that a contradictory statement made by a party could be used not only to attack his credibility but also as an admission. The court carefully stated that if such statement was not made, the rule would be inapplicable and further stated in effect that even if the jury believed the statement was made they could conclude he never in fact had a color TV set or that one had been given to him by another. The defendant does not seem to attack the correctness of the court's statement but claims comment on that particular piece of evidence tended to focus the jury's attention unduly on it. The court correctly stated the rule that an admission by a party could be used not only to affect his credibility but also to establish proof of matters stated therein. *Pluhowsky* v. *New Haven*, 151 Conn. 337, 343, 197 A.2d 645; *Sears* v. *Curtis*, 147 Conn. 311, 316, 160 A.2d 742. The instruction as given was applicable only to the defendant and was therefore proper.

The defendant introduced various witnesses who testified as to the defendant's general reputation in the community for truth and veracity and also as to their own personal opinion as to these character traits. The court charged at some length on the subject of general reputation. A portion of this part of the charge stated: "On a doubtful question, good reputation alone might be sufficient to raise a reasonable doubt as to the guilt of the accused." The court ended this portion of the charge by say-

ing: "It must be a general reputation representing a concensus [sic] of the common feeling of his fellows as to him." The defendant's claim of error is that the court also should have charged that "good character evidence need not be limited to a person's general character in the community, but may likewise be relevant and properly presented through the testimony of the opinion of a given individual as to that character." The defendant's criticism of the charge is that evidence of traits of character offered by one who has knowledge of those traits is also admissible in evidence in addition to evidence of general character. *Richmond* v. *Norwich*, 96 Conn. 582, 596, 115 A. 11. With regard to evidence of reputation, the charge was correct. *State* v. *Blake*, 157 Conn. 99, 104, 249 A.2d 232; *State* v. *Alderman*, 83 Conn. 597, 602, 78 A. 331. While the defendant did offer evidence of a personal trait for truth and veracity, the record does not reveal any request for a specific charge on this phase of the evidence. Under the circumstances, it was not error to omit reference to it from the charge. *State* v. *Penn*, 144 Conn. 148, 153, 127 A.2d 833.

The charge concerning the elements of knowledge and concealment necessary for conviction of the charge of receiving stolen goods is attacked by the defendant on the ground that the court improperly and unfairly commented on the evidence. The claim that the evidence was insufficient to warrant the charge is commented on in the portion of the opinion discussing the denial of the defendant's motion for judgment.

General Statutes § 53-65 provides that a criminal offense is committed by "[a]ny person who receives and conceals any stolen goods or articles, knowing them to be stolen." The essential elements of the

crime are: "(1) The property must have been stolen. (2) It must have been received by the accused with the knowledge that it was stolen. (3) It must have been concealed within the meaning of the law. (4) It must have been received and concealed by the accused with a felonious intent, that is, a criminal intent to deprive the true owner of his property." *State* v. *Palkimas,* 153 Conn. 555, 558, 219 A.2d 220; see also *State* v. *Alderman,* supra, 600. In commenting on the necessary element of the statute, that the television set must have been received with knowledge that it was stolen, the court stated that the state was relying on circumstantial evidence to prove knowledge. It cautioned the jury that carelessness of the accused in ascertaining the facts was not enough, but that they must find actual knowledge on his part at the time the television set was received. It then commented on the claims of the state relevant to knowledge.[3] The court commented on the claims of the defendant and further stated that if the knowledge was gained after the defendant came into possession of the television set, there could be no conviction.

---

[3] "Knowledge of the fact that the television set was stolen at the time when it was received can be inferred from the circumstances if they were such that a reasonable man of honest intentions should have come to that conclusion. On this element of the case the State claims that you have the right to draw an inference of knowledge from Paul Moynahan's admission that in 1965 he was at the home of Charles Vernale to investigate the theft of two TV sets and that these were later removed from the home of Charles Vernale by the State Police. The State also asks you to infer knowledge that the set in question, that is, Exhibit K, was stolen from the statements allegedly made by Paul Moynahan to Charles Vernale and to John Bishop to the effect that, 'Whatever business dealings you have is your business but if you do anything in Waterbury, I will have to nail you for it.'

"If you find that such a statement was made by Paul Moynahan and that he did participate in an investigation where stolen goods

Although the defendant makes other claims in his brief, the exception to this portion of the charge when made was limited to the claim that if the facts as stated were proven, each fact "standing by itself" would be insufficient as a matter of law to support a finding of knowledge. It is clear that the court combined the first two claims, and charged that if the jury found that the defendant did tell Bishop that he knew of his activities and if they found that the defendant did participate in recovery of stolen goods from the home of Vernale in 1965, an inference could be made that the defendant, as a reasonable man with honest intentions, should have known the set was stolen. The second reference in the charge alluded to the state's claim that through the entire personal and social relationship with Vernale, the defendant should have known that the television set was stolen. That knowledge of a fact may be inferred from other facts proven is a well-settled rule of evidence. The policy consideration underlying this rule is that frequently the only method of establishing what lay in the mind of a person when he performed an act is through such an inference.

---

were recovered from the home of Charles Vernale in 1965, you may draw the inference that he, Paul Moynahan, knew that Charles Vernale and John Bishop were engaged in nefarious business activities, and that he, Paul Moynahan, as a reasonable man with honest intentions should have known that the TV set, Exhibit K, was stolen at the time that it was allegedly delivered to him and allegedly received by him.

"The State also makes the claim that the entire personal and social relationship between Paul Moynahan and Charles Vernale was such that Paul Moynahan knew that Charles Vernale was dealing in merchandise stolen by John Bishop and from this relationship Paul Moynahan, as a reasonable man with honest intentions, should have known that the TV set, Exhibit K, was stolen when it was received by him, providing, of course, you do find that it was in fact received by him."

Circumstantial evidence is offered and received for this purpose and jurors are properly told that they may, not that they must, infer knowledge, intent, or mental state or condition from such facts. The purpose of the language in the charge was to instruct the jury that they were not to find guilty knowledge from these facts unless the defendant, as a reasonable man, should, from the same facts, have inferred at the time he received them that the goods were stolen. *State v. Pambianchi*, 139 Conn. 543, 546, 95 A.2d 695; *State v. Weiner*, 84 Conn. 411, 416, 417, 80 A. 198. This rule also applied to the second claim of the state as charged by the court. See *State v. Fredericks*, 149 Conn. 121, 124, 176 A.2d 581; *State v. Heno*, 119 Conn. 29, 32, 174 A. 181; *State v. Kaplan*, 72 Conn. 635, 45 A. 1018; *People v. Estrada*, 256 Cal. App. 2d 136, 157, 44 Cal. Rptr. 165; 66 Am. Jur. 2d, Receiving Stolen Property, § 25; note, 147 A.L.R. 1058. The court, by the use of the words "you may draw the inference," left the issue of the defendant's knowledge that the set was stolen to the jury. The court's charge on the issue of knowledge was proper.

The defendant excepted to the instruction in the charge on the necessary element of concealment contained in the statute,[4] first claiming that if the

[4] "Now, the third element of the crime of receiving stolen goods, you must be satisfied that, having received the goods knowing them to have been stolen, the accused concealed them. 'Concealed' as used in this statute has somewhat a broader meaning than that which one ordinarily uses the word, that is, to hide. It, of course, includes that, but the requirement of concealment is met if the accused did anything which would make the discovery or identification of the property more difficult.

"On this element of the crime of receiving stolen property, evidence has been offered by the State to indicate that the TV set was placed in the home of Paul Moynahan in a sun porch away from the view of the general public. If you accept such testimony and find it to

television set was smashed, the act of smashing must have "coalesced" in time with receipt of the set in order to prove concealment and secondly asserting that placing the set on the sun porch was not a concealment as a matter of law.

The word "conceals" in the statute is not used in a technical sense but includes all acts done which render the discovery or identification of property more difficult. *State* v. *Ward,* 49 Conn. 429, 442; *Wertheimer* v. *State,* 201 Ind. 572, 169 N.E. 40. The court's charge that the jury could conclude that the TV set was concealed if it believed testimony that the television set was placed by the defendant in a sun porch of his private home out of the view of the general public was correct. Concealment is not limited to proof that the stolen property was hidden or kept out of sight; it is enough if it is proven that the property was withheld from the owner and made difficult for the owner to discover and this includes acts or conduct which enables the one who

---

have been proven beyond a reasonable doubt, you can conclude that the TV set was concealed within the meaning of our law.

"There is also evidence before you to the effect that the police found smashed parts of the TV set in an isolated Greystone section of Terryville in the Town of Plymouth. Again, if you accept this testimony beyond a reasonable doubt, you can find that something was done to the set which made it more difficult to be discovered or identified.

"The act of smashing a TV set, if you find that such was the case here, constitutes an act of concealment within the meaning and intent of the statute relating to the crime of receiving stolen goods. On the other hand, if you find that the TV set and the component parts thereof which have been offered by the State in evidence was not delivered to the home of Paul Moynahan, and that Paul Moynahan did not smash the set, you must, of course, come to the conclusion that he could not have concealed it. In this event the essential elements of concealment will not have been proved by the State beyond a reasonable doubt, and again, in that event your verdict must be in his favor."

received the stolen goods to convert the property to his own use. *Commonwealth* v. *Matheson,* 328 Mass. 371, 103 N.E.2d 714; *State* v. *Crum,* 255 La. 60, 229 So. 2d 700; *Wertheimer* v. *State,* supra; 66 Am. Jur. 2d, Receiving Stolen Property, § 4.

The smashing of the television set was not an act that must have occurred when the set was received in order to be concealment within the meaning of the statute as claimed by the defendant. If the act of smashing the television set was found by the jury to have been accomplished by the defendant, it was an act "done which rendered the discovery or identification of the property more difficult." *State* v. *Ward,* supra. The court was not in error in charging as it did on the two elements of knowledge and concealment.

## III

The record reveals forty-four exceptions to court rulings occurring during the course of the trial. Only those assignments of error which merit comment will be discussed.

At the trial the state offered the testimony of Captain Bishop of the Connecticut state police regarding an interview with the defendant, conducted in the state's attorney's office in Waterbury in the presence of the state's attorney, Superintendent Sullivan of the Waterbury police department and two state police officers. The interview was recorded and a verbatim transcript was made and delivered to the defendant prior to trial. The state examined Captain Bishop as to his recollection of this interview. The defendant objected to this testimony, claiming that the transcript of the recorded interview was the best evidence. A distinction must be drawn between a case in which proof of the docu-

ment is essential and one in which the document is only collaterally involved. The best evidence rule has no application to the present case because the state was not attempting to establish the existence or the exact terms and contents of the verbatim transcript. The questions sought to discover what the witness had said during the interview. Anyone who has heard an oral statement made and remembers it may testify to what was said. *Brzezinski* v. *United States,* 198 F. 65, 66 (2d Cir.). Captain Bishop was not asked what the transcript contained but what the defendant had said in the interview. Where one testifies to what he has seen or heard, such testimony is primary evidence regardless of whether such facts are reduced to writing. While recordings might be more accurate and reliable evidence under ordinary circumstances than testimony from memory, the latter is not rendered incompetent by the fact of the existence of the former. *People* v. *Kulwin,* 102 Cal. App. 2d 104, 226 P.2d 672. The defendant has misinterpreted the applicability and purposes of the best evidence rule. *Farr* v. *Zoning Board of Appeals,* 139 Conn. 577, 582, 95 A.2d 792; *Kilpatrick* v. *Kilpatrick,* 123 Conn. 218, 225, 193 A. 765; 29 Am. Jur. 2d, Evidence, § 449. The defendant's brief points out suggested inconsistencies between the testimony of Captain Bishop and the actual contents of the statements as shown by the transcript. At all times, however, the defendant had possession of the entire transcript of the interview and, following proper procedure, could have used it in cross-examination to show discrepancies in any of the testimony given concerning this interview. Further, the use of the recording or the transcript of the recording would have run the risk of the prejudicial effect cautioned against in

*State* v. *Mortoro,* 160 Conn. 378, 390, 279 A.2d 546. The court was not in error in its ruling.

During the course of the trial the state informed the court that it intended to call Vernale as a witness. The state had contended that Vernale transferred a stolen television set to the defendant. Representing to the court that it could not vouch for the veracity of Vernale, the state requested that the court call him as a court's witness. The court refused, and instructed the state's attorney to call Vernale as a state's witness. Counsel for the defendant moved that the court make inquiry in the absence of the jury to determine if Vernale intended to invoke his fifth amendment privilege against self-incrimination. The motion was denied and an exception was taken. The court was then informed that Vernale's counsel had advised him to claim the privilege. The state represented to the court that Vernale had made contradictory statements under oath and that it did not know what his testimony would be and that his attorney had advised the state that he did not know what his client would do if called as a witness. The court then summoned the jury. Vernale was called as a witness for the state. Under questioning by the state Vernale stated he was then at the state prison; that he knew the defendant; that he had known the defendant for six or seven years; that his relationship with the defendant was strictly one of friendship; that he considered the defendant one of his friends and he pointed out the defendant to the court. When asked what his friendship involved, he stated he would "take the Fifth Amendment on that for the simple reason I don't want to incriminate myself in any way. This is not by [sic] trial." He was then asked if he ever was an informant for the defendant. He

answered he was never an informant. He was asked if he had given information on any criminal activities. He refused to answer. He was then asked: "Did you ever make a gift of a television set, a color television set to Moynahan?" He stated: "I take the Fifth Amendment on that. I don't want to incriminate myself." The state asked no further questions. The court ordered the state to reveal to the defendant evidence in its possession concerning Vernale which might be of material importance to the defense. Thereafter Vernale was cross-examined about the extent and the length of time of his friendship with the defendant; of his trip to Florida and his return with the defendant. He was then asked about his refusal to answer the question of whether he ever gave the defendant a television set. He replied: "That is right." He was then asked if he would take the fifth amendment on any inquiry about television sets and he replied in the negative and stated he was "willing to plead guilty for receiving stolen goods." He was then asked: "So you are willing to testify to some things and not to others?" He replied: "That is in my case. I do not want to incriminate myself. That is the only reason I took the Fifth Amendment." During the charge, the court gave cautionary instructions to the jury that no adverse inferences against the defendant should be drawn from Vernale's refusal to answer some questions.

The defendant objected and took an exception only to the court's refusal to interrogate Vernale in the absence of the jury to determine if he would take the privilege. Ordinarily, the claim of error would be dismissed as no such practice is required under our procedure and would not have been efficacious in any event. *Commonwealth* v. *Mar-*

*tino,* Mass. , 282 N.E.2d 647. The defendant, however, did alert the court to the constitutional problems which would arise if the state were allowed to call a witness who intended to refuse to answer questions. The errors claimed in the assignments of error which are briefed are, therefore, considered. *State* v. *Vars,* 154 Conn. 255, 271–72, 224 A.2d 744.

A prosecutor or state's attorney, in a criminal case, may not call anyone who, in any capacity, has become so involved in the defendant's criminal activities as to be liable to prosecution for the same offense or for another offense growing out of the transaction from which the defendant's alleged offenses arise, with a design or purpose of extracting a claim of privilege against self-incrimination. *United States* v. *Tucker,* 267 F.2d 212 (3d Cir.); *Vandergrift* v. *State,* 237 Md. 305, 206 A.2d 250; *People* v. *Pollack,* 21 N.Y.2d 206, 234 N.E.2d 223; see note, 86 A.L.R.2d 1443–59. In considering the constitutional question presented when the prosecution questions witnesses who elect to claim the fifth amendment privilege against self-incrimination, the Supreme Court in *Namet* v. *United States,* 373 U.S. 179, 83 S. Ct. 1151, 10 L. Ed. 2d 278, noted that two factors had been focused on by trial courts to determine whether such conduct was prejudicial error. The Supreme Court pointed out that some courts found that error may be based on prosecutorial misconduct, that is, a conscious and flagrant attempt by the prosecution to build its cases out of inferences arising from use of testimonial privilege. The second theory adopted by trial courts based a finding of error on the fact that inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the de-

fendant. *Namet* v. *United States,* supra, 186–87. The court in the *Namet* case pointed out that the few claims of privilege in that case were not the only source or even the chief source of the inference of criminal activity.

That portion of the defendant's brief relating to this claim is devoted chiefly to the conduct of the state's attorney. The record does not support any inference of prosecutorial misconduct. There was full disclosure in advance of Vernale's appearance and full discussion of the merits of the issue and procedure to be followed. The state was in a dilemma in that Vernale was a witness whom the state would naturally produce and one whom it had power to produce and his absence would be subject to an unfavorable inference under the rule as set forth in *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598; *Queen* v. *Gagliola,* 162 Conn. 164, 168, 292 A.2d 890; see also *United States* v. *Gernie,* 252 F.2d 664 (2d Cir.). The state revealed that it could not know to what Vernale would testify and when the witness did refuse to testify, the state did not continue to seek answers involving the issue of the television set on which the witness had claimed the privilege. The state's action in the case before us was a far cry from that of the prosecution in *Douglas* v. *Alabama,* 380 U.S. 415, 85 S. Ct. 1074, 13 L. Ed. 2d 934, relied on by the defendant. The *Douglas* case involved flagrant impropriety on the part of the prosecutor who read an accomplice's confession bit by bit in the form of questions, pausing to ask the witness after each piece: "Did you make that statement?" and thereby compelling repeated reliance on the witness' claim of privilege.

Viewing the entire record, the possible inferences

from Vernale's refusal to testify did not add critical weight to the state's case in a form not subject to cross-examination. The witness' selective use of the privilege on direct examination and the extent of Vernale's testimony during cross-examination, especially when asked directly why he refused to answer, demonstrate that the state was not using Vernale's invocation of the privilege in an improper manner. Furthermore, it cannot be said here that these claims of privilege were the only source or the chief source of the inference of criminal activity. *Namet* v. *United States,* supra, 189; *United States* v. *Jenkins,* 442 F.2d 429 (5th Cir.); *United States ex rel. Fournier* v. *Pinto,* 408 F.2d 539 (3d Cir.), habeas corpus granted due to a combination of the prosecutor's misconduct and error in the charge. The court's cautionary charge on this issue to the jury was curative of any prejudice which might possibly have arisen because of this witness' claim of privilege. No error was committed in allowing the testimony of Vernale to the extent it was given.

After Miller had testified for the state and had identified the television set in evidence as the set he had repaired at the home of the defendant, counsel for the defendant stated he intended to cross-examine the witness "to establish a fixed motive in his mind which would be indicative of untruthfulness." Thereafter, an extensive cross-examination followed. The defendant has assigned error in six instances concerning this examination. The line of inquiry which the defendant claims he was not allowed to follow was intentionally abandoned after Miller had been questioned in the absence of the jury, and therefore the claim that cross-examination was unduly restricted is utterly without merit.

The defendant also claims that the court was in

error concerning the offer of the testimony of two persons who, the defendant claimed, purchased from Miller television sets which later were discovered to have been stolen. The defendant established, while cross-examining Miller, that in 1967 he sold two television sets which he had obtained from Vernale. One set was sold to Mr. Sterena and the other to Mr. Gaspari. The offer of proof by the defendant was that both witnesses would testify that the sets they bought from Miller were later confiscated and impounded by the police as stolen sets. The court sustained the objection by the state to such evidence on the ground that it went into collateral matters. Counsel for the defendant admitted that the offered evidence would not go to proof that Miller knew the sets were stolen, and therefore the claim that such sales were admissible on the theory of bias cannot be supported. The purpose claimed for the evidence was for negative inferences, that is, if Miller did not know the sets he obtained from Vernale were stolen, such proof would help to undermine the inference that the defendant knew the set he received was stolen. The defendant also claimed the evidence was offered to "rebut" Bishop's testimony with regard to the size of sets he had stolen. The ruling of the court was correct. "The trier has wide discretion in ruling on the relevancy of evidence. *State* v. *Towles,* 155 Conn. 516, 523, 235 A.2d 639, and cases cited. It is a reasonable exercise of judicial discretion to exclude questions which would introduce issues foreign to the case; *State* v. *Dortch,* 139 Conn. 317, 325, 93 A.2d 490; or evidence the relevancy of which appears to be so slight and inconsequential that to admit it would distract attention which should be concentrated on vital issues of the case.

*State* v. *Bassett,* 151 Conn. 547, 551, 200 A.2d 473." *State* v. *Mahmood,* 158 Conn. 536, 540, 265 A.2d 83.

At the close of the direct testimony of Miller and of Vernale the defendant moved for all prior statements and investigatory inquiry testimony of these witnesses. The finding indicates that as to Miller an order was made in chambers instructing the state to turn over any matter which might be of assistance to the defendant. The record is silent with regard to the exact terms of the order or what was turned over to the defendant. The transcript of Miller's testimony has been examined and it is silent as to any order or, if one was given, what was received pursuant to it. The state's brief indicates that it turned over to the defendant previous statements of Miller as well as relevant testimony of Miller before the investigatory inquiry. The record and the defendant's brief indicate that the state did turn over some prior statements of Miller. The order made in chambers as stated in the finding has not been challenged by either party.

As to Vernale, the court ordered the state "to disclose to Mr. Hennessey evidence in its exclusive possession which is not merely cumulative or embellishing and which may be of material importance to the defense, regardless of whether it relates to testimony given at the trial." This order apparently was grounded on the separate opinion of Justice Fortas in *Giles* v. *Maryland,* 386 U.S. 66, 98, 87 S. Ct. 793, 17 L. Ed. 2d 737, one of the three opinions making up the majority in that case. There is nothing in the record or in the defendant's claims that indicates that the state did not comply with the orders of the court as given in either instance.

On receipt of Vernale's statements made prior to

trial, the defendant made a motion for mistrial or dismissal on the ground that the materials furnished were exculpatory and should have been given prior to trial when demanded by pretrial motion for disclosure. The pretrial orders were restricted to exculpatory materials only and not to such evidence which would be an aid generally to the defendant. The defendant has not pointed to any evidence which he received during the trial which tends logically to exculpate the defendant and justifies a motion to dismiss or a motion for mistrial based on the state's failure to provide exculpatory evidence under the pretrial order.

The claim that the court erred in allowing the state to determine which statements to turn over to the defendant is a more difficult question to resolve because the record does not contain a full account of the proceeding. It is evident, however, that at least as far as Vernale was concerned, the state, in compliance with the court's order, did not turn over all of Vernale's statements made prior to trial or all of his testimony before the investigatory inquiry. The defendant claims that he had a right to examine all such statements and that he, rather than the state, should make the determination from the materials of what information would aid him in his defense, and that the court should at least have made an in-camera inspection of materials claimed by the state to be exempt.

The defendant relies heavily on the case of *Dennis* v. *United States,* 384 U.S. 855, 86 S. Ct. 1840, 16 L. Ed. 2d 972. In the *Dennis* case the decision is in part based on Rule 6 (e) of the Federal Rules of Criminal Procedure which grants to the trial court power to direct disclosure of grand jury testimony. See the cases collected in annotations

in 3 A.L.R. Fed. 29 and 5 A.L.R.3d 819. Connecticut has no comparable rule. See the cases collected in 20 A.L.R.3d 7, involving grand juries.

Under our law an accused is not entitled to disclosure of the minutes of a constitutional grand jury proceeding merely for assistance in preparing a defense. *State* v. *Hayes,* 127 Conn. 543, 579–80, 18 A.2d 895. Where an investigatory inquiry has been made, by authority of General Statutes § 54-47, only the testimony of an accused is given to him as a matter of right. Although at the time of trial §§ 54-86 (a) and (b) were in existence, we need not determine whether these sections of the statute were purely procedural in nature and therefore not binding on the Superior Court; *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 145 Conn. 222, 140 A.2d 863; because the defendant had his own testimony taken at the inquiry by virtue of the right under § 54-47 and because the order of the court was more sweeping in favor of the defendant and was based not on the statute, but, as previously stated, followed Justice Fortas' opinion in *Giles* v. *Maryland,* supra.

As we had no rules of procedure governing discovery in criminal cases at the time this case was tried,[5] the action of the court is to be determined by the standard of due process guaranteed by the fourteenth amendment of the United States constitution as expressed in such cases as *Giles* v. *Maryland,* supra, *Miller* v. *Pate,* 386 U.S. 1, 87 S. Ct. 785, 17 L. Ed. 2d 690, *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215. While the state has an obligation not to suppress any evidence which would materially aid a defendant's case, there

---

[5] Chapter 22A of the Practice Book, Discovery in Criminal Cases, became effective October 1, 1972.

is nothing in the record, in the appendices or in the briefs to indicate that any such evidence was withheld or that the state did not comply with the order of the court. The heart of the holding in the *Brady* case is the prosecution's suppression of evidence in the face of a defense production request where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression, (b) evidence favorable to the defense and (c) materiality. These are the standards by which the prosecution's conduct is to be measured. *Moore* v. *Illinois,* 408 U.S. 786, 794, 795, 92 S. Ct. 2562, 33 L. Ed. 2d 706. The *Brady* case does not require the prosecutor to permit the defendant to examine the prosecution's file to determine what is favorable. See *United States* v. *Evanchik,* 413 F.2d 950 (2d Cir.). While the defendant has shown that all statements of the witnesses were not given to the defense, he has not demonstrated that any favorable evidence material to issues of guilt or punishment was suppressed and has, therefore, failed to show a violation of the principle of the *Brady* case and *Napue* v. *Illinois,* 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217. Since it has not been shown that the defendant's due process rights were denied by the state's action, this court cannot base a finding of error on the unsupported speculation of the defense that materials relevant to the issues of guilt or punishment favorable to the defendant were withheld by the state and would have been discovered had an in-camera inspection by the trial court been held.

The defendant vigorously objected to and excepted to testimony offered by the state concerning acts and statements of the defendant which the state claimed were admissible as evidence tending to show

a consciousness of guilt. In the absence of the jury, the state informed the court of the nature of the evidence which it proposed to present. The defendant objected and also requested that a "dry run" of the evidence be presented to the court in the absence of the jury. The court denied the request and allowed the state to proceed with its evidence. Edward Courtney, a state police sergeant, testified that on the evening of March 10, 1969, he was visited at his home by the defendant and Henry Byrnes, the chief of detectives of the Waterbury police, and that for a month prior to that date he had been assigned with a team of investigators to investigate a stolen goods ring in the city of Waterbury. He further testified that when the defendant and Byrnes arrived at his home he entered the defendant's automobile and while there was asked in a boisterous and argumentative tone by the defendant if he had said he was out "to get" the defendant. Courtney testified that he denied making the statement and that the defendant at that time was yelling and pointing his finger at Courtney. The substance of the conversation which followed was that if Courtney wanted the defendant, Courtney could have him right on the street there; the defendant stated that the state's attorney was trying to tie him with another to Vernale and to place him with a stolen television set from Vernale; the defendant further said television sets were small items and insurance companies pay off on them. The defendant also told Courtney in a loud voice that policemen should protect policemen, not persecute them; the defendant denied ever taking anything from Vernale or anyone else and at some point in the conversation the defendant's references were to the entire Waterbury police department. During his testimony,

Courtney was asked if obscenities were used by the defendant to refer to Captain Bishop and the state's attorney and Courtney stated there were and repeated them.

The state then produced two state police officers, and State's Attorney Francis McDonald and his wife, to relate an incident at McDonald's home on the same evening at about 1:30 a.m. following the earlier encounter between the defendant and Courtney. McDonald testified that prior to that evening he had been present when the defendant was interviewed by Captain Bishop at which time the defendant was advised that allegations had been made that he had received stolen property from a fence, Vernale. In substance, the testimony of the state's attorney was that the defendant and Byrnes went to the state's attorney's home about 1:30 a.m. on March 11, 1969. The defendant banged on the door and awoke the McDonald family. He called to the second-floor window and stated who he was and stated he wanted to talk to McDonald. At that time he spoke in a loud, challenging, voice. McDonald called the state police. Until the police came, the pounding continued and at one time the defendant stated: "Frank, Frank, I want to talk to you. Come down. Come down, you hero, you. Come down." McDonald, his wife and three children were frightened by the episode. When the state police arrived they found the defendant and Byrnes outside the McDonald home. The defendant seemed excited and stated he wanted to talk to McDonald but that the latter, whom he referred to in obscenities, did not have the guts to talk to him. Byrnes appeared intoxicated but the defendant, although he had a moderate odor of alcohol, was able to speak clearly.

In a criminal trial, it is relevant to show the con-

duct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. *State* v. *Cronin,* 64 Conn. 293, 304–5, 29 A. 536. The state of mind which is characterized as "guilty consciousness" or "consciousness of guilt" is strong evidence that the person is indeed guilty; 2 Wigmore, Evidence (3d Ed.) § 273; and, under proper safeguards, hereinafter discussed, is admissible evidence against an accused. *United States* v. *Friedman,* 445 F.2d 1076, 1081 (9th Cir.); *Harrell* v. *United States,* 220 F.2d 516 (5th Cir.); *State* v. *Holliday,* 159 Conn. 169, 268 A.2d 368; *State* v. *Leopold,* 110 Conn. 55, 66–67, 147 A. 118; *In re Durant,* 80 Conn. 140, 151, 67 A. 497; *State* v. *Caliendo,* 136 Me. 169, 4 A.2d 837; *State* v. *Mills,* 51 N.J. 277, 240 A.2d 1, cert. denied, 393 U.S. 832, 89 S. Ct. 105, 21 L. Ed. 2d 104; 1 Wharton, Criminal Evidence (12th Ed.) § 209. The defendant relies strongly on the case of *Gawn* v. *State,* 13 Ohio C.C.R. 116, 7 Ohio C. Dec. 19, for the proposition that acts or statements against a prosecutor should be inadmissible. See also 22A C.J.S., Criminal Law, § 636. In that case, however, at the time threats against the prosecutor were made, the accused had no reason to anticipate that he was to be accused and under those conditions his threats could not be a manifestation of a "consciousness of guilt." Note, 8 A.L.R. 1361. In addition, the threats in the *Gawn* case were an attempt to prevent prosecution of another individual not the defendant in the case.

The defendant argues that he was not under arrest and that his acts and statements were mostly an argument with a police officer and a desire to get an investigation moving rather than to suppress

it. Without repeating the recital of facts previously stated, it is clear that such evidence would indicate a "consciousness of guilt," since the defendant knew at the time that the investigation was centered on his activities and on himself. Furthermore, the defendant was given every opportunity to present his version of the incident to the jury which simply did not accept his explanation of the nocturnal visitation.

Before evidence is allowed to be given, however, the court must also consider whether its prejudicial tendency outweighs its probative value. *State* v. *Marquez*, 160 Conn. 47, 52, 273 A.2d 689; *State* v. *Johnson*, 160 Conn. 28, 33, 273 A.2d 702; *State* v. *Holliday*, supra, 173. Not only was evidence given which could be interpreted as an effort on the part of the defendant to influence the state's attorney, but evidence was also given as to the effect of the defendant's conduct on the wife and children of the state's attorney. If such evidence had no probative force or was of inconsequential value to the state in the proof of the defendant's guilt, then, of course, it should not have been admitted because of its prejudicial effect. In view, however, of the defendant's claim that his acts and statements did not constitute conduct evincing consciousness of guilt, the state was justified in showing the actual statements made, the manner in which they were made and the intensity and duration of the acts. The effect of these actions on the persons he reasonably could expect would be affected was relevant to show the manner, intensity and duration of such conduct, all of which tended to show the defendant's state of mind, that is, his consciousness of guilt. This evidence was also reasonably necessary since the only direct evidence of the defendant's guilt was testi-

mony of a felon whose veracity could be questioned and subjected to disbelief by a jury. Balancing this probative value against any prejudicial effect the evidence might have had, the court was not in error in allowing the state to produce this evidence. McCormick, Evidence § 157, pp. 332–33; 6 Wigmore, Evidence (3d Ed.) § 1904; 1 Wharton, Criminal Evidence (12th Ed.) § 151; see also *State* v. *Holliday,* 159 Conn. 169, 173, 268 A.2d 368.; *Thibodeau* v. *Connecticut Co.,* 139 Conn. 9, 14, 89 A.2d 223.

The defendant claims error in the court's ruling during the cross-examination of Timothy Moynahan, the defendant's son, which admitted evidence concerning his arrest as proof of bias, interest and motive. A claim of error in the admission of evidence is to be tested by the finding. Practice Book § 648; *State* v. *Harris,* 147 Conn. 589, 599, 164 A.2d 399; *Facey* v. *Merkle,* 146 Conn. 129, 131, 148 A.2d 261. The defendant's son testified in his father's behalf. He further testified that he had represented Vernale from 1965 to 1968. During the presentation of the state's case evidence was offered to establish that the defendant's son, Timothy, had received a stolen air conditioner from Vernale. The witness stated that in August, 1967, he opened an office in Watertown and Vernale gave him an air conditioner. In February, 1969, when he first learned it had been stolen, he immediately told the state's attorney and the air conditioner was removed from his office by the state police the next day. On cross-examination Timothy Moynahan was asked: "Attorney Moynahan, is it true that you presently have pending against you in this particular court an information charging you with conspiracy with your father to receive stolen goods?" The state claimed the admissibility of this evidence on the

basis of interest, motive and bias, "particularly as there are charges pending from the very same investigation."

The defendant objected on the grounds that (1) the rules governing the right of the defense to cross-examine a state witness are not applicable to the state's claim of right to cross-examine a defense witness; (2) such evidence was not relevant to any issue of bias, interest or motive; and (3) the attempt was to impeach the witness' testimony by attacking credibility through the impermissible vehicle of proof of arrest without a conviction.

The defendant's claim that the scope of cross-examination of defense witnesses is more restricted than the scope of cross-examination of witnesses for the prosecution is without merit. Rules governing the admissibility of evidence are with few exceptions the same for the trial of civil and criminal cases. *State* v. *Parker,* 112 Conn. 39, 54, 151 A. 325; *State* v. *Willis,* 71 Conn. 293, 306, 41 A. 820; 1 Wigmore, Evidence (3d Ed.) § 4 (2); 58 Am. Jur., Witnesses, §§ 611, 616. The right, extent of, and limitation on cross-examination generally was well stated in *Fahey* v. *Clark,* 125 Conn. 44, 3 A.2d 313; see also *Fordiani's Petition,* 99 Conn. 551, 561, 121 A. 796. In *State* v. *Griswold,* 67 Conn. 290, 307, 34 A. 1046, commenting particularly on an accused's taking the stand in a criminal case in his own behalf, this court noted that by taking the stand the accused "subjected himself to the same rules, and was called upon to submit to the same tests which could by law be applied to other witnesses. . . . Having elected to become a witness in his own behalf, he occupied for the time being the position of any other witness, with all its duties and obligations." See also *People* v. *Shapiro,* 308 N.Y. 453, 126 N.E.2d 559; 58 Am.

Jur., Witnesses, §§ 611, 616. This reasoning must apply as well to witnesses who testify for the defendant.

The two remaining claims, that the evidence was not relevant to any issue of bias, interest or motive and that a witness' testimony may not be impeached by proof of an arrest without conviction, are discussed together.

Evidence of a conviction of a crime where punishment may be more than a one-year-term of imprisonment is admissible in evidence to affect credibility. *Heating Acceptance Corporation* v. *Patterson,* 152 Conn. 467, 472, 208 A.2d 341. Evidence of arrest without conviction, however, is not admissible as evidence to attack the credibility of a witness. *Hayward* v. *Maroney,* 86 Conn. 261, 262, 85 A. 379; *Card* v. *Foot,* 57 Conn. 427, 432, 18 A. 713; see the cases collected in note, 20 A.L.R.2d 1421, 1425 § 3. The offer of evidence that the witness had been arrested was not for the purpose of attacking his credibility, but to show bias, interest and motive. The right to show bias, interest or motive was clearly enunciated in *State* v. *Luzzi,* 147 Conn. 40, 46, 156 A.2d 505, wherein it was stated: "Cross-examination to elicit facts which tend to show motive, interest, bias or prejudice is a matter of right, and although the extent of such cross-examination may often rest in the sound discretion of the court, a denial of the right, or its undue restriction, will constitute reversible error. . . . It is generally held that cross-examination for this purpose is a substantial legal right which may not be abrogated or abridged at the discretion of the court to the prejudice of the cross-examining party."

In *United States* v. *Dardi,* 330 F.2d 316 (2d Cir.), cert. denied, 379 U.S. 845, 85 S. Ct. 50, 13 L. Ed. 2d

50, it was stated: "While an arrest alone is not normally admissible to impair the credibility of a witness, the fact that it might embitter him so as to motivate him to testify as he has may be relevant." In *People* v. *Barr,* 51 Ill. 2d 50, 280 N.E.2d 708, it is stated: "[T]he fact that a witness has been arrested or charged with a crime may be shown or inquired into where it would reasonably tend to indicate that his testimony might be influenced by interest, bias or a motive to testify falsely." *People* v. *Mason,* 28 Ill. 2d 396, 401, 192 N.E.2d 835; see also *Ford* v. *Kremer,*     Mass.    , 277 N.E.2d 679.

In *Hayward* v. *Maroney,* supra, relied on by the defendant, it was held that the arrest of the plaintiff was not admissible to show bias. An examination of the record and briefs, however, demonstrates that in offering the evidence of the arrest, "[i]t was not stated in what connection any motive or bias was intended to be shown." 124 Rec. & Briefs, p. 298. In *State* v. *Tropiano,* 158 Conn. 412, 426, 262 A.2d 147, cert. denied, 398 U.S. 949, 90 S. Ct. 1866, 26 L. Ed. 2d 288, it is indicated that evidence of the not guilty plea of a witness and his subsequent sentencing were matters which were admissible on the ground of motive, interest or bias and it was error on the part of the court to exclude such evidence.

In the present case, Timothy Moynahan was arrested and charged as a coconspirator with his father stemming from the same investigation and involving the same type of criminal behavior and the same informant. Under such circumstances the state had the right to cross-examine him to show whatever bias, interest or prejudice he might have regarding the case. 3 Wigmore, Evidence §§ 949, 967 (Chadbourn Rev., 1970); 58 Am. Jur., Wit-

nesses, § 755; note, 20 A.L.R.2d 1421, 1440 § 7, 1446 § 12. Of course, the effect of such evidence in determining whether the witness was in fact biased or had a motive to falsify his testimony would be for the consideration of the jury. It was for the court to determine whether the prejudicial effect of this evidence would outweigh its probative value. The court did not abuse its discretion in the ruling. *State* v. *Marquez,* 160 Conn. 47, 52, 273 A.2d 689; *State* v. *Johnson,* 160 Conn. 28, 33, 273 A.2d 702.

During the cross-examination of Timothy Moynahan the state brought out that on one occasion he represented Lieutenant Griffin in a negligence suit against Vernale. While this claim was pending he also represented Vernale in a criminal action. The state then interrogated Timothy Moynahan about the canons of professional ethics and particularly Canon 6. Practice Book, p. 4. He was asked if, in his opinion, he violated the canon. The court permitted this question as related to the representation of Vernale. Assuming without deciding that a violation of Canon 6 would not tend to indicate a lack of veracity, the court's action in allowing this limited inquiry was at most harmless error. If the record discloses that the ruling could not reasonably have affected the verdict, it is not harmful and hence not reversible error. *State* v. *Tropiano,* supra; *DeCarufel* v. *Colonial Trust Co.,* 143 Conn. 18, 21, 118 A.2d 798. Examination of the record clearly establishes that defense counsel stated that the inquiry was a legal interpretation of Canon 6 and that there were "a number of legal opinions with respect to the interpretation of Canon 6 in the particular situation that Mr. Gaffney is inquiring into" and the witness emphatically denied the claim that his conduct violated Canon 6 and no further in-

quiry was made by the state. It is clear that this evidence was not so prejudicial to the defendant as to affect the verdict. *State* v. *Tropiano,* supra.

## IV

The final claim of the defendant is that the court erred in denying his motion for judgment notwithstanding the verdict because the verdict was not supported by the evidence. This claim is tested by the evidence that appears in the appendices to the briefs. *State* v. *Cofone,* 164 Conn. 162, 319 A.2d 381; *State* v. *Cari,* 163 Conn. 174, 303 A.2d 7. The appendices not only support the evidence included in the finding but are more extensive. There is no need to repeat the evidence printed in the appendices since the state's claims of proof in the finding are all repeated in the appendices and, if believed by the jury, justified their verdict. It is apparent that there could not have been any serious controversy as to the fact that the described television set was stolen or as to its value. The testimony relating to whether the defendant knowingly received and concealed a stolen television set was in direct conflict. From the evidence printed in the appendices, as previously recited, it is apparent that the jury, in the rightful exercise of their province in making reasonable inferences and in passing upon the credibility of witnesses, including that of the defendant, could have found against the defendant. The evidence offered in this case supported the jury's verdict.

There is no error.

In this opinion the other judges concurred.