OSTILIO FORDIANI'S PETITION FOR NATURALIZATION.

Third Judicial District, New Haven, June Term, 1923.

WHEELER, C. J., BEACH, CURTIS, BURPEE and KEELER, JS.

An order of the City Court of Meriden denying a petition for naturalization, is a judgment, and if the conclusions of the City Court that the petitioner is unfit for citizenship are not supported by and are inconsistent with the subordinate findings of fact, they are reviewable by this court on appeal.

A court of this State, when conducting naturalization hearings, acts judicially and by a recognized procedure, and if it makes erroneous rulings in interlocutory proceedings, or in the taking of evidence, whereby one of the parties is deprived of his right to a fair trial or to a full hearing, its decision will be reversed.

In the present case, the petitioner introduced twenty-four witnesses and an equal number of exhibits to prove his fitness for citizenship. The United States produced five witnesses in opposition, four of whom offered no testimony to support certain paragraphs in the finding of the City Court that the petitioner had not behaved as a man of good moral character, nor as a man attached to the principles of the Constitution, nor as a person well disposed to the good order and happiness of the United States. The other witness for the United States testified that the petitioner was an anarchist, and had taught anarchy in a school conducted by him, and that he had made remarks derogatory to the United States. On cross-examination, it appeared that all this testimony was hearsay and not legal evidence, except the statement concerning the remarks derogatory to the United States, and, when asked to state when and where the petitioner had made these remarks, the witness replied with irrelevant matter. *Held* that under the circumstances,

this statement did not create a conflict of evidence with that offered by the petitioner, and that the motion to strike out the paragraphs of the finding should have been granted.

Examiners who are not attorneys are permitted to conduct naturalization proceedings in the courts of this State, but they must treat all petitioners and witnesses fairly, and if they make serious accusations against petitioners without evidence, it constitutes reversible error, it being the duty of the examiners to prove such accusations by sworn witnesses.

The extent of cross-examination must often rest in the sound discretion of the court, but that discretion must never be so far abused as to restrict the legitimate search for the truth.

In the present case, a Catholic priest with whom the petitioner had quarreled, testified that the petitioner was an anarchist and a bolshevist; that he had made derogatory remarks concerning the United States government; that he had taught anarchy in the church school, and that he had deserted his family and been arrested in New Jersey. *Held* that the petitioner should have been permitted by cross-examination and by the testimony of his wife and his employer, to show bias, malice, and prejudice on the part of the witness.

All witnesses must be treated by the one standard of impartiality, equality and fairness, whatever their station and occupation in life.]

Argued June 15th—decided July 27th, 1923.

APPEAL from a judgment of the City Court of Meriden, *Dunne, J.*, denying the application of the petitioner for naturalization. *Error and new trial ordered.*

*Lewis J. Somers*, for the appellant (petitioner).

*George H. Cohen*, Assistant United States Attorney, for the appellee (the United States).

WHEELER, C. J. The court heard the petition for naturalization and denied it because it appeared that the petitioner "has not been attached to the principles of the Constitution of the United States nor disposed to the good order and happiness of the same." The court has found that the petitioner has resided

in the United States continuously for a period of five years, and in Meriden for one year preceding the date of his petition, and that during this period he has not behaved as a man of good moral character, nor as a man attached to the principles of the Constitution of the United States, nor as a person well disposed to the good order and happiness of the United States.

In his appeal the petitioner seeks to have these findings stricken out, and has attached all the evidence in the case in support of his motion to correct and exceptions. The Government insists that these are findings of fact which this court cannot review, while the petitioner insists that the findings are reviewable. The record shows that the petitioner has not only been unfairly deprived of his right to naturalization, but also throughout the hearing of the City Court been denied the rights which the law guarantees to every litigant and which are vitally essential in order to secure justice to a petitioner for naturalization. Since the order is a judgment, these ultimate findings cannot stand, for the reason that the subordinate facts which are found in the draft-finding and marked proven, are wholly inconsistent with these conclusions of fact. The subordinate facts fail logically to support these conclusions and hence are reviewable by us. *Lawler* v. *Hartford Street Ry. Co.*, 72 Conn. 74, 81, 43 Atl. 545; *Levy* v. *Metropolis Mfg. Co.*, 73 Conn. 559, 564, 48 Atl. 429; *Metcalf* v. *Central Vermont Ry. Co.*, 78 Conn. 614, 619, 63 Atl. 633.

The subordinate facts tell us that Ostilio Fordiani was born at Bologna, Italy, October 10th, 1883, spent his boyhood there and was married May 3d, 1905, to Mancius Adelusia, with whom he has continued in marital relations ever since; and from this union eight children were born, all of whom are now living, between one and one half and sixteen years of age. For about

one and a half years prior to his emigration to the United States, the petitioner was employed in one factory. In 1907 he, at the age of twenty-four, with his family, emigrated to the United States. While in Italy he was never arrested. On arrival at New York he came immediately to New Haven where he remained from 1907 to 1913, being employed by Sargent & Company from his arrival in New Haven until he moved in 1913 to Meriden. While in New Haven he organized a school for the teaching of Italian grammar and literature gratuitously to Italians, and among the witnesses at the hearing was one of such students. He was never arrested in New Haven, and while there had not been an anarchist, nor a disbeliever in nor opposed to organized government. Neither had he been a member of, nor affiliated with, any organization entertaining and teaching such belief in opposition to organized government. Upon his removal to Meriden he entered the employ of the M. B. Schenck Company, by whom he has been employed ever since, except for a few months during the war, first as an ordinary laborer, and then by perseverance and industry he worked up to the position of one of the four division superintendents of the company, and during all this period he has been a sober, steady and industrious worker. Soon after his arrival in Meriden, the petitioner and his family became associated with an Italian Catholic Church, of which the Reverend Father Ricci was pastor. At various times he had been elected president of the Catholic Society and a director in the Catholic Dramatic Society, which societies were connected with this church. In the year 1917 the petitioner joined the Home Guard of Meriden, a part of the State militia, and remained therein until his removal toward the end of the year 1917 to Newark, New Jersey, when he received an honorable discharge. When the United

States entered the war in 1917, the petitioner received a letter from his father suggesting that he either enter the army or engage in some war activity. Thereupon he decided to enter the employ of the Submarine Boat Corporation, a government enterprise in said Newark. The petitioner corresponded with his wife while at Newark, and she and their children joined him there in the spring of 1918, and remained with him until their return to Meriden. Shortly after the petitioner left Meriden for Newark, Father Ricci called upon his wife and learned that the petitioner was out of town, and he thereupon went to the selectmen, the Organized Charities Department, and a grocer, and reported that the Fordiani family were in want and suffering. Mrs. Fordiani had not gone to any of these persons or this Charities Department, or to any other person for aid. On account of the coal famine the selectmen left one half ton of coal with Mrs. Fordiani, but this was done without the knowledge or consent of the petitioner. During the petitioner's absence from his family, they lived rent free in one of the houses of the Schenck Company. In August, 1918, the Schenck Company sent for the petitioner and offered him his former position, and he and his family returned to Meriden and he resumed his former employment. At no time was the petitioner arrested in New York, Philadelphia, Newark, or elsewhere, and brought back to Meriden. During the war the petitioner was one of the so-called "Four Minute" speakers, and spoke during the war in its behalf. In the spring of 1919, a school for the teaching of Italian grammar, etc., was organized by Father Ricci and conducted in the basement of his church, and the petitioner was appointed director of the school and had one assistant. The sessions were held every night except Sunday, with an average attendance of fifty, one half

being children and the other half young men under twenty-one years, including two nephews of Father Ricci. At almost every session of the school Father Ricci was present. The supplies for the school were paid for by a society of the church of which the petitioner was the president.

In the year 1920 a conflict arose among the members of the church over the question of the erection of a new church and school. The petitioner was appointed vice-chairman and treasurer of that one of the two factions which was desirous of building a new church and school, and began to solicit funds for the same. Thereafter the petitioner and his family joined the Italian Baptist Church of Meriden. About this time Father Ricci was assaulted, but he did not know who did it. The petitioner was not present when the assault occurred, knew nothing of it, and was in no way concerned in it. At various times both at New Haven and Meriden, the petitioner had conducted schools gratuitously for the teaching of the Italian language and grammar. While in Meriden the petitioner had been a member of, and had held various offices in, The Societa Catholica Educativa, The Catholic Dramatic Society, Diaz Society, Sons of Italy, and Victor Emmanuel Society; and all of these are patriotic organizations devoted to the happiness and welfare of the United States. The petitioner's application herein was filed February 18th, 1921.

These facts demonstrate conclusively that the findings made by the court and which the petitioner seeks to have stricken out, were wholly inconsistent with these subordinate facts and cannot be logically supported as conclusions of fact.

Upon another ground these conclusions of fact made by the court cannot stand. The petitioner introduced twenty-four witnesses and an equal number of exhibits;

the United States five witnesses; of these four do not support the court's findings, while one, Father Ricci, did testify on direct, that the petitioner was an anarchist and had taught anarchy in his school and made remarks derogatory to the United States. On cross-examination it appeared that all of this was mere hearsay and not legal evidence, except the statement that the petitioner had made remarks derogatory to the United States. When twice asked when and where the petitioner had criticised the government of the United States, the witness replied with irrelevant matter. Under these circumstances this statement cannot be held to create a conflict of evidence with that offered by the petitioner. The motion to strike out these paragraphs of the finding, should have been granted.

We have examined the other paragraphs of the motion to correct which the court failed to find, or to mark proven, and in the main find them supported by the evidence. Their incorporation in the finding would do no more than to accentuate the positions already taken.

Some of the rulings complained of were these: The petitioner appeared at the hearing without counsel and testified in his own behalf, and was then cross-examined by the naturalization examiner who appeared in behalf of the United States, as follows: "Q. Have you ever been arrested for seditious utterances? A. No. Q. Have you ever taught anarchistic and socialistic doctrines? A. I have conducted a school, but I have not taught anarchistic or socialistic doctrines. Q. Have you made the statement that you would rather be Lenine or Trotzky than president of the United States? A. It is not so. Mr. Church: I have learned from good authority that you have been arrested twenty or more times in Italy for seditious utterances. The Witness: It is untrue, I have never been arrested in Italy. Q. Why did you rejoice in the bomb explosion in Wall Street?

A. It is not so. Q. Did the Federal authorities ever pick you up and hold you for a hearing? A. It is not so. Q. Didn't you desert your family? And weren't they dependent upon the town for support? A. It is untrue. Q. Why have you been arrested and picked up by the police in New York and Philadelphia. A. It is untrue. Mr. Church: You are an anarchist, a bolshevist, an I. W. W., and not a fit person to become a citizen of the United States. The Witness: All of those statements are untrue. The Court: No man with a cloud of suspicion about him relative to his loyalty to the United States shall pass while I am judge, I will continue this case until September."

We permit examiners who are not attorneys to conduct these proceedings in the Superior Court in behalf of the United States, but they must remember that they must treat the petitioners and all witnesses fairly. They have no right to themselves testify, nor to assail and insult the witness. In this case the record indicates that the examiner had little or no foundation for his most serious accusations. But whether he had reason to believe these or not, he had no business to himself assert them; his business was to prove them by the sworn witness. The court should have stopped the examiner and made it very clear to him that that method of conducting a naturalization proceeding would not be tolerated in any of our courts. If this stood by itself,—the sole error assigned,—we should regard it as reversible error.

The only witness produced by the United States whose direct testimony affected the essentials of the petitioner's case was Father Ricci, the pastor of Our Lady of Mt. Carmel Church, an Italian Catholic Church in Meriden. Father Ricci testified on his direct examination that the petitioner was an anarchist and a bolshevist; that he had made derogatory remarks concern-

ing the United States government; that he had taught anarchy in the school conducted in the basement of his church, and that he had deserted his family and been arrested in Newark, New Jersey. Counsel for the petitioner well says: "It was, therefore, of the most vital importance to Fordiani that he be allowed a searching cross-examination." The following occurred on the cross-examination: "Q. Did you engage Mr. Fordiani to teach in the basement of your church in 1919? A. Yes. . . . Q. Why did you engage and continue him in that work if he was an anarchist and was teaching anarchy? A. I did not know it until later when I was told about it. . . . Q. When did he discuss or talk anarchy or bolshevism in your presence? A. On several occasions he appeared to be out of his mind. Q. I did not ask you that, kindly answer my question. A. I am not to be catechised. Q. You are here to answer my questions as well as any one else. The Court: You have not the right, Mr. Somers, to address the Rev. Father in that style. Mr. Somers: He has been constantly shifting and refusing to answer my questions. Q. When and where did Fordiani talk anarchy, bolshevism, or criticize the government of the United States? A. On several occasions he appeared to be out of his head and drunk. . . . Q. When and where did Ostilio Fordiani talk anarchy, or bolshevism, or criticise the government of the United States? A. He acted like a wild man, one out of his head. Q. Answer my question. A. One time he came into the church, opened the door and struck my brother, and hurt him, my brother said—Mr. Somers: I am not asking you about your brother or what he said. Why don't you answer my question? The Court: I will not permit you to go any further in this matter. . . . Q. How do you know that Ostilio Fordiani left his family and left them in want? A. His wife told me. She went to Tommassetti, the grocer for charity,

he told me so. She went to the town selectmen. Q. Did you go to Selectman Miller and tell him that she and her family were in want? A. No, she did herself. Q. You are no friend of Ostilio Fordiani? A. He broke up my church. Q. Did you go to his employer and try to get him discharged? The Court: I will not permit an examination into that matter. Mr. Somers: For the purpose of showing the malevolence, bias and prejudice of this priest, we propose to show that—The Court: I don't care what you propose to show. I will not permit you to go into that matter. Mr. Somers: We object to the court's position and except to such ruling."

The petitioner introduced W. A. Schenck as a witness, who was the vice-president of his employer, M. B. Schenck Company, and on his direct examination the following occurred: "Q. Do you know Father Ricci? A. Yes, by sight. Q. Did he ever call upon you with reference to Fordiani? A. Yes, he called at my house one evening in 1921. Q. Will you relate what was said to you by Father Ricci about Ostilio Fordiani? The Court: I will not permit you to go into that matter. Mr. Somers: For the purpose of proving bias, prejudice and malevolence on the part of Father Ricci toward Ostilio Fordiani, we propose to show by this witness that Father Ricci tried to get the witness to discharge Fordiani by telling him that Fordiani had tried to murder him and—The Court: Do not go any further. I will not permit it. Mr. Somers: We wish the record— The Court: I don't care anything about the record. Mr. Somers: We object to the ruling and except to this action on the part of this court."

When counsel for the petitioner attempted to prove by the wife of the petitioner the bias, malice and prejudice of Father Ricci toward the petitioner, the court twice refused to permit him to go into this matter, to which rulings the counsel duly excepted. The course

of the court in persistently and arbitrarily denying the right of legitimate cross-examination of Father Ricci upon matters gone into upon the direct, and in order to show the bias of the witness, was most extraordinary and totally contrary to the ordinary practice in our courts. Cross-examination is the greatest aid to the ascertainment of the truth which the advocate possesses. Its extent must often rest in the sound discretion of the court; that discretion must never be so far abused as to restrict the legitimate search for the truth. All witnesses must be treated by the one standard of impartiality, equality and fairness, whatever their station or occupation in life. And every litigant and his lawyer, must be accorded those fundamental rights which our law gives. One of the most important of these is the right to fair and reasonable cross-examination. Greenleaf on Evidence, in Vol. 1 (14th Ed.) § 446, describes the power and uses of cross-examination in words which have often been quoted: "The power of cross-examination has been justly said to be one of the principal, as it certainly is one of the most efficacious, tests, which the law has devised for the discovery of truth. By means of it, the situation of the witness with respect to the parties, and to the subject of litigation, his interest, his motives, his inclination and prejudices, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony, the manner in which he has used those means, his powers of discernment, memory, and description, are all fully investigated and ascertained, and submitted to the consideration of the jury, before whom he has testified, and who have thus had an opportunity of observing his demeanor, and of determining the just weight and value of his testimony. It is not easy for a witness, who is subjected to this test, to impose on a court or jury; for however artful the fabrication of falsehood may be, it cannot embrace

all the circumstances to which a cross-examination may be extended."

We repeat what we said upon the motion to dismiss (98 Conn. 435, 439, 446, 120 Atl. 338: "Whenever it [the court] acts, it acts judicially and by a recognized procedure. When it hears a petition in naturalization it can act in no other way than its normal and legal way, for the proceeding is a judicial proceeding. . . . Rulings made in interlocutory proceedings and in the taking of the evidence, though erroneous, because not conforming strictly to the rules of law, will not furnish ground for successful appeal, unless the rulings have deprived one of the parties of his right to a fair trial, or to a full hearing, or to a determination which is made in violation of law or with an abuse of discretion." The rulings complained of fall directly within this ruling. The trial court in the conduct of the case in the several rulings we have referred to committed manifest error.

There is error and a new trial is ordered.

In this opinion the other judges concurred.