[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
RULINGS RE: PLAINTIFF'S MOTION FOR SANCTIONS (FILE #133)AND DEFENDANT'S CROSS-MOTION FOR SANCTIONS (FILE #134)
By prior order of this court, East Hartford Plaza Holding Corp., as the assignee of Chemical Bank's rights in the present litigation, was substituted as plaintiff herein. The instant motion was filed and argued during the course of an evidentiary hearing which was being conducted on plaintiff's motion for a deficiency judgment; title vested pursuant to a judgment of strict foreclosure on June 9, 1994. The real property involved is known as East Hartford Plaza, a shopping center of approximately 146,318 square feet of gross leasable area, located at 465-475, 483, and 489 Main Street, East Hartford. The judgment of strict foreclosure entered by stipulation of the parties, and the debt was stipulated at $5,812,000. At issue in the pending evidentiary hearing is the fair market value of the subject shopping plaza on the date title vested in the foreclosing plaintiff.
In undertaking to establish a deficiency, plaintiff has presented the direct testimony of William E. Kane, Jr., MAI, an experienced, state certified commercial real estate appraiser. Mr. Kane has been associated with the real estate appraisal firm of Edward F. Heberger and Associates, Inc. (now, Lexington Heberger Companies) since January, 1983. Through Mr. Kane, plaintiff has admitted into evidence the Heberger Associates appraisal report dated July 12, 1994; principals of the Heberger firm who were signatories to that appraisal report were Edward F. Heberger, MAI, CRE; William E. Kane, Jr., MAI; and Paul Stewart.
The final version of the July 12, 1994 appraisal report sets forth the fair market value of the shopping plaza at $4,500,000. During cross-examination of William E. Kane, Jr., other appraisals done by the Heberger firm on the subject real property CT Page 11281-A were admitted into evidence, including an appraisal report on the same property dated January 5, 1994, showing an estimated fair market value of $5,200,000.
The appraisal reports each employ two methods of arriving at the estimated fair market value of the shopping center: the sales comparison approach, and the income capitalization approach. Estimated value under the income capitalization methodology involves analysis of market rental and expense data, analysis of subject leases, estimation of market rent and expenses of the subject, forecast of pertinent market parameters, and pro forma estimation of net operating income. Involved in the income capitalization approach is a discounted cash flow analysis, which attempts to convert future benefits to present value by utilizing an appropriate discount rate. According to the appraisal report, under this methodology, pertinent data is analyzed to arrive at an appropriate discount rate, and pro forma net income and an estimated reversionary value are then discounted to calculate an estimated current leased fee market value. The Heberger firm's prior appraisal report (January 5, 1994) discounted at 13%; the firm's final appraisal report dated July 12, 1995 used a discount rate of 14%. Understandably, plaintiff's witness Kane has been, and quite likely will continue to be, closely cross-examined on the increased discount rate utilized in the more recent Heberger report.
Defendant's attorney represents as a client, in an entirely unrelated case, a person having an interest in real property located in New Haven which is currently in litigation. It is stated that the New Haven client engaged the Heberger firm to appraise the New Haven commercial realty in connection with that litigation. On or about June 26, 1995, on which date Mr. Kane was undergoing cross-examination in the present case, defendant's counsel had a telephone conversation with Mr. Paul Steward, a principal in the Heberger firm, and a signatory to the appraisal(s) in this case, regarding the possible use of a 14% discount rate (instead of 13%) in the New Haven litigation. During a recess on June 27, 1995, defendant's attorney, in the courtroom (at the bar rail), engaged in a brief conversation with Mr. Kane; the latter stated that he was informed by the attorney that the attorney had spoken with Mr. Stewart the preceding day. Mr. Kane informed plaintiff's attorney of the conversation; upon inquiry, Mr. Stewart reported that he was engaged in an appraisal of the other property (New Haven property), and that the telephone conversation related to whether the same discount rate CT Page 11281-B of 14%, utilized in this case (July 12, 1994 report), might also be used in arriving at an opinion of value with respect to the property involved in the New Haven case.
On the instant motion for sanctions, both parties have filed affidavits which confirm, substantially, the aforesaid. The affidavit of William E. Kane, Jr., dated July 12, 1995, states, in pertinent part, substantially the following: (1) prior to 10/1/94, he was a shareholder in, and employee of, the real estate appraisal and consultant firm of Edward F. Heberger and Associates, Inc.; thereafter, he became a member of Lexington Heberger Companies, L.L.C., the successor by merger to Heberger and Associates; (2) the 1/5/94 appraisal was prepared by Heberger "for use in a possible foreclosure action by the Bank; (3) the engagement of Heberger involved, also, preparation of an updated appraisal and valuation for use in a proceeding on a motion for deficiency judgment brought by the Bank's nominee, East Hartford Plaza Holding Corp.; (4) the updating resulted in several versions of the appraisal, bearing valuation dates of June 9 or 10, 1994, each version including a transmittal letter dated July 12, 1994 ; however, the final version was not in fact completed until mid-November 1994; (5) the engagement of the Heberger firm also encompassed a review of the opposing party's appraisal of the shopping plaza prepared by The Nocera Company, and consultation by members of the Heberger firm with plaintiff's attorney(s) preparatory for the cross-examination of the Nocera expert regarding the value of the shopping plaza property on June 9, 1994; (6) in such regard, the Heberger firm became privy to information relating to plaintiff's attorneys' preparation, strategy, opinions, mental impressions, and similar matters pertaining to the cross-examination of Nocera; (7) in connection with the Heberger firm's engagement, three employees participated in the appraisal, valuation, and services the firm provided: affiant, Edward F. Heberger, and Paul W. Stewart; (8) the 1/5/94 report and the updates, including the final report, were all signed by the three stated members of the firm: affiant, E.F. Heberger, and P.W. Stewart; (9) the participation of Mr. Heberger and Mr. Stewart consisted of consultation with the affiant on various factors relevant to the formulation of the Heberger firm's opinion as to value, and the value assessment of the Nocera firm; furthermore, the 1/5/94 report and the updates, including the final report, were signed by all three members of the Heberger firm (affiant, Heberger, and Stewart), reflecting that the valuations were not merely the affiant's opinion, but "represented the opinions of the Heberger firm;" (10) the affiant CT Page 11281-C believed that communications between members of the Heberger firm and the Bank, and the Bank's attorneys, were confidential, and were not to be disclosed to any party except as required by law; (11) on 6/27/95, during a court recess, the affiant was approached by defendant's attorney who stated that he had spoken with Mr. Stewart either earlier that day or the preceding day; however, the attorney did not disclose the substance of the conversation with Mr. Stewart; nevertheless, "the nature and substance" of the disclosure by the attorney was "intimidating" in that it led affiant to believe that the attorney had received some information from Stewart which the attorney planned to use to discredit affiant's testimony; (12) when the affiant inquired of Mr. Stewart regarding the conversation with defendant's attorney, he was informed that the Heberger firm was working on an appraisal for the attorney (or a client of the attorney) relating to a different property, and, that the attorney had asked Stewart whether the same 14% overall discount rate that the firm had used in its final valuation of the real property in this case might be used as the discount rate in arriving at the value of other property in the other (New Haven) case; (13) on the morning of June 29, 1995, the affiant advised one of plaintiff's attorneys of his aforestated conversations with defendant's attorney and Mr. Stewart; (14) in the affiant's presence (using a speaker phone), plaintiff's attorney telephoned Mr. Stewart who repeated what he had stated to affiant regarding the subject matter of his telephone conversation with defendant's attorney; and, (15) when plaintiff's attorney inquired of Mr. Stewart concerning what, if anything the latter had said in response to the inquiry regarding the possibility of using the same 14% discount rate with respect to the new [New] Haven property, Mr. Stewart responded that he did not believe he should say anything further about the conversation; plaintiff's attorney stated that if Mr. Stewart felt it was inappropriate to say anything further, the attorney would not press it, and the conversation between plaintiff's attorney and Stewart ended.
The affidavit of defendant's attorney, dated August 2, 1995, states, in pertinent part, substantially as follows: (1) a client of the affiant had retained the Heberger firm over one year ago as an expert witness, on a matter other than that involved in the present case, regarding the foreclosure of certain properties located in New Haven; (2) the Heberger firm was disclosed as an expert witness in conjunction with that matter; (3) the client in that foreclosure recently faxed a document to the Heberger firm referencing a 14% discount rate, with the intent of ascertaining CT Page 11281-D whether a 14% discount rate could be used, and what the numerical effect of such a discount rate would be; (4) following up on that communication, the affiant discussed with Mr. Stewart the circumstance that the client wished the 14% rate to be utilized in connection with the foreclosure involving that New Haven property, to which Stewart indicated he could not adopt a 14% discount rate, and the affiant requested Mr. Stewart perform the mathematical calculation to yield the result which would have been reached upon application of the 14% rate; (5) affiant's communication with Mr. Stewart was solely in connection with the Heberger firm's services in the other foreclosure matter, had nothing to do with the instant case, and the only discussion with Stewart "concerning the case at bar was [affiant's] . . . passing, ironic reference that the 14% rate requested by . . [affiant's] client in the other matter was the same 14% rate being addressed in the case at bar;" (6) the conversation between the affiant and Mr. Kane occurred in the courtroom during the morning recess at the June 27, 1995 hearing, in the area of the bar rail, while plaintiff's attorneys were seated at counsel table, and with other persons behind affiant, including Mr. Nocera; (7) the conversation with Mr. Kane was "an inconsequential, non-substantive conversation, of the sort which is typically conducted during breaks in court proceedings," and was conducted "in a normal speaking tone," with "no intimidation intended or apparently perceived by Mr. Kane," and without any discussion of "the merits of the case with Mr. Kane;" and, (8) Mr. Kane continued to speak willingly with affiant, he neither expressed nor displayed any indicia of discomfort or intimidation, plaintiff's attorneys registered no objection to the conversation taking place with Mr. Kane, and once the hearing resumed, Mr. Kane continued to testify without mention of the conversation, or of any concern or intimidation resulting therefrom.
It is plaintiff's contention that counsel for defendant engaged in an ex parte telephone conversation with Paul W. Stewart, a principle in the Heberger firm, and a signatory on the appraisal report(s) in this case, in violation of Prac. Bk. Rules 219 and 220, and the ethical obligations of an attorney; the requested sanction is an order that defendant's attorney be precluded from further cross-examining plaintiff's expert with respect to the 14% discount rate used in the final valuation of the East Hartford shopping center property. Concerning the conversation with Mr. Stewart, plaintiff's counsel states that he was not advised in advance that the opposing attorney would be CT Page 11281-E conferring with Mr. Stewart, he was not a participant in that conversation, and since Stewart will not now reveal what was said concerning the 14% discount rate, it becomes impossible to assess the existence and extent of any unfair advantage that could have been derived from the said conversation.
Concerning plaintiff's contentions, reference has been made by defendant to proceedings in this case on two prior motions resulting in rulings by coordinate judges of this court. The first involved a motion to preclude filed by the defendant, heard January 3, 1995; that motion dealt with the applicability of Section 220(D), counsel for the defendant protesting that he had not been furnished with the appraisal report dated July 12, 1994 until late November 1994, on the eve of the then scheduled deficiency judgment evidentiary hearing. The oral argument on defendant's motion to preclude centered on the issue of the application of the rules of practice to deficiency judgment proceedings, plaintiff maintaining that preclusion should be denied in that Section 220(D) does not apply in such proceedings; the court in denying defendant's motion stated:
 "It is my ruling that Section 220(D) does not apply to hearings on deficiency judgments. In the most narrow, technical sense, there simply is no trial list claim filed, and by the plain language of 220(D) it cannot apply . . .
 Section 526 . . . specifically requires the service of an appraisal with a motion for judgment of strict foreclosure. There is no such provision in either rule or statute for a deficiency judgment proceeding. So, as a matter of statutory interpretation, Section 220(D) does not apply to a deficiency judgment proceeding . . . Considerations of due process are easily handled within the ability of the bench to ensure that injustice does not result from late disclosure."
It is now plaintiff's position now that the defendant's attorney's conversation with plaintiff's expert violated Section 220 which states that "[d]iscovery of facts known and opinions held by experts . . . acquired or developed in anticipation of litigation or for trial, may be obtained only as" set forth in CT Page 11281-F the entirety of that rule of practice. Defendant argues that the prior ruling, which denied the motion to preclude, established the "law of the case" with regard to Section 220, and accordingly, that entire rule has no applicability to this deficiency judgment proceeding. Therefore, defendant argues, any failure to follow, or to comply with, the procedures outlined in Section 220 in this proceeding (a motion for deficiency judgment) would provide no basis for an imposition of sanctions.
Defendant also directs the court's attention to a ruling on plaintiff's motion for a protective order entered on April 10, 1995. Defendant contends that the prior ruling is germane (as well as dispositive) regarding plaintiff's position that allowing contact with an opposing party's expert, outside the parameters of Section 220, would permit revelation to the opposition of confidential, privileged, and/or work-product information. With respect to the protective order motion, plaintiff had designated certain environmental experts as witnesses who would testify at the deficiency judgment hearing; their anticipated testimony concerned the environmental condition of the shopping plaza property, as well as estimated remedial costs, all of which would diminish the value of the commercial realty. At their depositions, defendant sought to examine these experts regarding information provided them by plaintiff's attorney(s), exactly what information they had considered, and conversations they had had with the attorneys. Plaintiff moved for the protective order asserting that such examination of the deponents would elicit privileged communications, confidential materials, and work-product information; defendant argued that once an expert had been disclosed as a witness who would testify at trial (contrasted to an expert simply retained to serve as a consultant to counsel during the litigation), the opposing party could "interrogate [the] expert as to his communications even with plaintiff's counsel, . . . as to what conversations he may have had with [the] lawyers," and as to what information was provided to the expert. It was (and is) defendant's position that once the experts are revealed as witnesses who will testify at trial, such inquiry is necessary and appropriate in terms of impeaching the underlying basis for the expert's opinion. In denying plaintiff's motion for a protective order respecting the environmental experts, the coordinate court noted the Practice Book distinction between experts who are declared as witnesses who will testify at trial, and those who are not, ruling that any such privilege or confidentiality would not extend to the former. On the present motion, defendant maintains that since it was previously ruled no CT Page 11281-G privilege exits regarding conversations between an attorney and an expert designated to testify at trial, restricting or denying access to the opposition's expert would serve no valid purpose, particularly where there is also a prior ruling placing in question the applicability of Rule 220 in deficiency judgment proceedings.
Plaintiff acknowledges that there does not appear to be Connecticut caselaw specifically addressing the question of whether an attorney's ex parte or direct communication with an adversary's expert witness is violative of the provisions of Prac. Bk. Section 220. Referring to comparable language in the Fed. Rules Civ. Prac., Rule 26(b)(4), plaintiff cites a Ninth Circuit case dealing with the imposition of sanctions following one party's contact with the other's declared expert. In CampbellIndustries v. M/V Gemini, 619 F.2d 24 (9th Cir. 1980), the plaintiff, Campbell, listed Torbert on its witness list (submitted to the court, and included in the pretrial conference order) as an expert witness to be called at trial; Torbert was also listed as a witness, though not an expert, on the defendant Gemini's, list. Shortly before trial, Gemini asked permission of the District Court to take Torbert's deposition to perpetuate his testimony for trial; it was then revealed that defendant's counsel had contacted Torbert on several occasions while the expert was in the employ of Campbell. Either "because of these contacts or otherwise," Torbert had agreed to testify for Gemini. The District court denied Gemini's request to depose Torbert, and as a sanction for the defendant's "`flagrant violation' of the rules governing discovery of expert witness," the Court also issued an order precluding any testimony by Torbert at trial. The Ninth Circuit, in upholding imposition of the sanction, stated:
 "The District Court considered Gemini's ex parte contacts with Torbert to be a flagrant violation of the provisions of Fed.R.Civ.P. 26 deserving strong sanction. One obvious factor in our review is that the preclusion of Torbert's testimony did not unduly prejudice Gemini's case: Gemini was not prevented from calling one or more of its three retained experts, who inspected M/V Gemini at the same time as Torbert. . . . Indeed, one of Gemini three experts testified at trial on precisely the issues that Torbert would have covered.
We cannot say that the District Court's ruling, CT Page 11281-H which was carefully fashioned to deny Gemini the fruits of its misconduct yet not interfere with Gemini's right to produce other relevant expert testimony, constituted an abuse of discretion."
Plaintiff also cites MMR/Wallace Power and Industrial, Inc.v. Thames Associates et al, 764 F. Sup. 712 (D.Conn. 1991), which involved a motion to disqualify counsel for the defendant Thames as a result of that attorney's contacts and negotiations with one Willett, a long-term and "irreplaceable member" of the plaintiff MMR/Wallace's litigation team. The contacts and negotiations with Willett led to his switching sides and, in the same case, becoming the litigation consultant for defendant Thames. Although the case did not involve direct contact with, and an attempted utilization of, an opposing party's expert witness, as in Gemini, the case did center on the gaining of an unfair advantage in the adversary proceeding by obtaining, or becoming privy to, the other side's confidential and privileged material. Willett had been the office manager at the subject site for a number of years; had assisted MMR/Wallace's attorneys, over a long period of time, in their preparation of the litigation; had prepared a number of reports and analyses, both at the request of the attorneys and on his own initiative, concerning issues involved in the litigation; attended, and participated in, a number of confidential meetings with plaintiff's counsel to discuss litigation tactics and strategies; assisted counsel in answering interrogatories; and had consulted with plaintiff's counsel regarding the people who were going to be disposed, discussing possible relevant topics to explore with them. Willett's subsequent discussions with the defense, and his switching of sides, apparently stemmed from an inability to obtain a firm commitment regarding continued employment as a consultant for MMR/Wallace, and his not having been paid funds that were owed him by MMR for past services. While the degree of unfair advantage that might have been obtained in the MMR/Wallace case would seem far greater than any that conceivably could have been obtained in the instant case, Judge Burns certainly did emphatically confirm that "the spirit of the ethical norms adhered to in this District . . . precludes an attorney from acquiring, inadvertently or otherwise, confidential or privileged information about his adversary's litigation strategy." In ruling on the motion to disqualify, the District Court stated:
 "Here counsel not only interviewed Willett, a member of his adversary's litigation team, but CT Page 11281-I sought to hire him for defendant's exclusive use. To condone such conduct, and simply allow Willett to switch camps, could, by potentially giving Thames unrestricted access to plaintiff's trial strategies and tactics, have a devastating effect on the outcome of the litigation."
Plaintiff has also cited cases from two other jurisdictions (Idaho and Illinois) dealing with ex parte interviews with treating physicians and medical experts in medical malpractice cases. These cases generally relied upon public policy considerations fortifying a patient's reliance on the ethical obligation of the treating physician to protect the fiduciary and confidential nature of the physician-patient relationship in terms of providing medical information to the legal adversary only through authorized methods of discovery; those precise considerations are not specifically involved in the instant case.[1]
This court does not minimize the ethical issues raised by direct ex parte contact with an expert witness who will testify (or where a member of the expert's firm is testifying) for the opposing party on the central issue in the case. The dangers incident to such contact, in the sense of a party obtaining information, confidential or tactical in nature, and thereby acquiring an unfair advantage in the litigation, are indeed exceedingly important concerns relating to, and impacting upon, the basic integrity of the adversary proceeding. Nevertheless, there are certainly significant distinctions between the circumstances of this case and those relied upon by plaintiff. Most significantly, the defense attorney here spoke to Mr. Stewart regarding the discount rate to be used in an entirely different case, and, in a case in which the attorney's client had retained the Heberger firm as its own expert. While the subject-matter briefly discussed was very similar to an important issue in the present case (the utilization of a 13% or 14% discount rate), and although there was passing reference to the 14% rate used here, the fact is that the attorney was talking to his
client's expert (a member of the Heberger firm) with regard to an entirely separate, unrelated case. The circumstances here are substantially incomparable with the more egregious factual events detailed in the cases relied upon by plaintiff; unlike the factual situations in those cases, there does not exist here, in the court's view, a realistic basis for any conclusion that defendant's attorney, in discussing another case with Heberger's CT Page 11281-J Mr. Stewart, may have garnered confidential or privileged data regarding plaintiff's strategy and/or trial preparation in the litigation of this case, or information which would provide defendant with an unfair advantage in this case. In the case at bar, the discussion with the Heberger expert concerned an appropriate discount rate in a separate, unrelated case; there is no indication that confidential information with regard to this case was discussed; there was no effort to have experts "switch camps;" and, certainly, the contact with Stewart on another case did not "potentially" give defendant "unrestricted access to plaintiff's trial strategies and tactics." In regard to trial strategies and discussions, as plaintiff acknowledges, the "seminal decision" in Berkley Photo, Inc. v. Eastman KodakCompany, 74 FRD 613 (S.D.N.Y. 1977) explains that otherwise privileged information (including attorney's work product and attorney-client communications) communicated to an expert witness may not necessarily be shielded from disclosure to an adversary where that information may have had an impact on the opiniontestified to by the expert.[2] Plaintiff's Memorandum, 7/21/95, p. 16-17. Such would appear to be consistent with Suffield Bankv. Berman, 228 Conn. 766, 776-78 (1994).
The right and opportunity to cross-examine an opposing party's witness is an important, fundamental, and essential component of the adversarial method of resolving disputes; that right and opportunity should not be abridged or restricted absent clearly irrelevant inquiry or, more to the point, the establishment with specificity of a necessity to do so in order to assure the fairness and integrity of the proceeding. The right to fully and incisively cross-examine an adversary's expert is particularly important in a case such as this where resolution of the ultimate issue necessarily involves close analysis of expert appraisal testimony. "Cross-examination is the principle means by which the believability of a witness and the truth of his testimony are tested." State v. Oulette, 190 Conn. 84, 101 (1983) quoting Davis V. Alaska, 415 U.S. 308, 316 (1974). "Cross-examination is the greatest aid to the ascertainment of the truth which the advocate possesses." Wadell v. Zoning Board of Appeals,136 Conn. 1, 8, (1949) quoting Fordiani's Petition, 99 Conn. 551,561 (1923). "The power of cross-examination has been justly said to be one of the principal, as it certainly is one of the most efficacious tests, which the law has devised for discovery of truth." Id. "[A] denial of the right to cross-examine may easily lead to the acceptance of testimony at its face value when its lack of credibility or the necessity for accepting it only with CT Page 11281-K qualifications can be shown by cross-examination." Id.
Here, the defendant's attorney discussed with the Heberger firm the discount rate to be applied in another case; in thatother case, the client whom the attorney represented had retained that appraisal firm; there is no indication that privileged or confidential information regarding trial preparation and strategy was obtained by the defense which would render it unfairly advantaged in this litigation; and there certainly was no effort to "co-opt" or "transform" the plaintiff's expert and/or litigation consultant.[3] Additionally, there were prior rulings in this case which, at the very least, had placed in question the applicability of the Rule 220 procedures to deficiency judgment proceedings, and the availability of any privilege regarding an expert declared to testify. While, in my view, plaintiff's concerns respecting opposing counsel's discussion with Mr. Stewart were not unwarranted, the operative facts do not justify an abridgement of the opportunity to thoroughly cross-examine plaintiff's expert on a critical element of the methodology relied upon in formulating an opinion of the value of the subject property.[4]
Plaintiff's motion for sanctions is denied; defendant's cross-motion for sanctions is denied.
Mulcahy, J.